ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

| | |
|---|---|
| STATE OF SOUTH CAROLINA ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF PICKENS ) | |

|  |  |
|---|---|
| The Estate of Latoya Nicole Valentine, ) | |
| by and through Debra Grate, Personal ) | |
| Representative and Debra Grate, in her ) | |
| Individual Capacity, ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **SUMMONS** |
| ) | |
| The State of South Carolina, the Office of the ) | |
| Governor, Henry D. McMaster, Nimrata "Nikki" ) | |
| Haley, Joshua Baker, Christian Soura, the South ) | |
| Carolina Department of Health and Human ) | |
| Services, the South Carolina Department ) | |
| of Disabilities and Special Needs, the Pickens ) | |
| County Disabilities and Special Needs Board, ) | |
| Robert Kerr, Patrick Maley, Mary Poole, Lois ) | |
| Park Mole, Susan Beck, Beverly Buscemi, ) | |
| Kathi Lacy, William Barfield, Thomas Waring, ) | |
| Kerr & Company, William Danielson, Elaine ) | |
| Thena, John Owens and Diane Anderson, ) | |
| Stanley Butkus, and Sam Waldrep, ) | |
| Defendants. ) | |

**YOU ARE HEREBY SUMMONED AND REQUIRED** to Answer the Complaint herein, a copy of which is herewith served upon you, and to serve a copy of your Answer to the Complaint upon the subscriber at his office at 1012 East Washington, Greenville, South Carolina 29601 within thirty (30) days of the date hereof, exclusive of the day of such service, and if you fail to Answer the Complaint within the time aforesaid, the Plaintiffs will apply to the Court for the relief requested in the Complaint.

*Signature to follow*

1

Respectfully submitted,

s/Patricia Logan Harrison
Patricia Logan Harrison
57 Rosemond Road
Cleveland, South Carolina
803 360 5555
pharrison@loganharrisonlaw.com


s/ William I. Bouton
William I. Bouton
Wilkins & Bouton
1012 E. Washington Street
Greenville, South Carolina 29601
864 312 3901
wbouton@wilkinsbouton.com

November 30, 2018
Greenville, South Carolina

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

| | |
|---|---|
| STATE OF SOUTH CAROLINA | ) IN THE COURT OF COMMON PLEAS |
| COUNTY OF PICKENS | ) |
| | ) |
| The Estate of Latoya Nicole Valentine, | ) |
| by and through Debra Grate, Personal | ) |
| Representative and Debra Grate, in her | ) |
| Individual Capacity, | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )                    COMPLAINT |
| | ) |
| The State of South Carolina, the Office of the | ) |
| Governor, Henry D. McMaster, Nimrata "Nikki" | ) |
| Haley, Joshua Baker, Christian Soura, the South | ) |
| Carolina Department of Health and Human | ) |
| Services, the South Carolina Department | ) |
| of Disabilities and Special Needs, the Pickens | ) |
| County Disabilities and Special Needs Board, | ) |
| Robert Kerr, Patrick Maley, Mary Poole, Lois | ) |
| Park Mole, Susan Beck, Beverly Buscemi, | ) |
| Kathi Lacy, William Barfield, Thomas Waring, | ) |
| Kerr & Company, William Danielson, Elaine | ) |
| Thena, John Owens and Diane Anderson, | ) |
| Stanley Butkus, and Sam Waldrep, | ) |
| Defendants. | ) |

_____

The Plaintiffs, complaining of the Defendants above named, would respectfully show unto the Court as follows:

## Introduction

1.    This suit is brought by Plaintiffs Debra Gate, in her capacity as Personal Representative for the Estate of Latoya Nicole Valentine, and by Debra Grate, in her individual capacity. Plaintiffs allege violations under the Tort Claims Act and common law of torts, violations of the Americans with Disabilities Act (the "ADA") [42 U.S.C. § 12101 et seq.] and Section 504 of the

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

Rehabilitation Act [29 U.S.C. § 701 et seq.], fraud and misrepresentation, conspiracy and *quantum meruit.*

## PARTIES

### Plaintiffs

2.     **Latoya Nicole "Nikki" Valentine** (hereinafter "Valentine") was a 40-year-old resident of Oconee County when she died on September 21, 2017.

3.     Valentine's full-scale IQ was 36 and she functioned at the mental age of child less than four years of age.

4.     According to the South Carolina Department of Disabilities and Special Needs (DDSN) records, at age 21, Valentine's vocational age equivalence was 1.83 years old and her adaptive behavior was 2.38 years old.

5.     Valentine was a qualified disabled person as defined in the Americans with Disabilities Act (ADA).

6.     Valentine received services provided by the Pickens County Disabilities and Special Needs Board (PCDSNB) through a Medicaid waiver program administered by DDSN under contract with the state Medicaid agency, the South Carolina Department of Health and Human Services (DHHS), which is responsible for the administration of all waiver programs in South Carolina.

7.     The waiver program provides services to persons who would otherwise require institutional care, including residential care, personal care attendant service, respite and in-home nursing that the "regular" State Plan Medicaid program does not provide to persons who do not meet institutional level of care.

4

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

8.      Valentine participated in the Intellectual Disabilities/Related Disabilities (ID/RD) waiver program due to her low IQ and limited functional skills.

9.      Valentine developed depression, psychosis, obesity, hypertension and hyponatremia while residing in facilities operated by the PCDSNB and in 2015, PCDSNB's psychiatrist diagnosed Valentine with autism.

10.     Hyponatremia results from an electrolyte imbalance that causes confusion, headaches, and loss of consciousness, but Valentine's family was never informed about Valentine being diagnosed with and treated for this dangerous condition.

11.     Valentine's sister, **Debra Grate,** was appointed as Personal Representative of the Estate of Latoya Nicole Valentine on December 11, 2017.

12.     Grate is a citizen of South Carolina and a taxpayer who resides in Oconee County.

**Agency Defendants**

13.     **The State of South Carolina**, **the Office of the Governor, the South Carolina Department of Health and Human Services (DHHS), the Department of Disabilities and Special Needs (DDSN) and the Pickens County Disabilities and Special Needs Board (PCDSNB)** are all public entities, as defined in 42 USCS § 12131 of the ADA.

14.     The **Governor** is the Chief Magistrate and supreme executive authority of the State who appoints every member of the governing board of DDSN.

15.     The Governor also appoints every member of the PCDSNB, pursuant to County Ordinance 2-174.

16.     The Governor is also responsible for assuring that the state is in compliance with the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

17.    **The South Carolina Department of Health and Human Services (DHHS)** has a nondelegable duty to administer all Medicaid programs pursuant to S.C. Code 44-6-30 and federal law, and the Governor has the power to appoint and remove the director of DHHS.

18.    DHHS has a nondelegable duty to assure that Medicaid programs are operated in compliance with all federal and state laws and to protect the health and welfare of all Medicaid waiver participants.

19.    DHHS is responsible for formulating and promulgating reasonable standards and procedures to administer Medicaid programs so that they are administered effectively, equitably, and economically, and in accordance with both federal and state statutes, regulations, policies and priorities.

20.    The Director of DHHS is obligated by statute to inform the Governor and the General Assembly of the effectiveness of the criteria, standards, and procedures used by the Medicaid program and to work closely with the Governor's Office in preparing Medicaid budgets and administering waiver programs.

21.    DHHS is charged with the responsibility of developing systems, in conjunction with other state agencies, to coordinate with local planning agencies and participating state agencies in matters related to health care and to perform its nondelegable duties as the State Medicaid Agency.

22.    Pursuant to S.C. Code 44-6-70, in cooperation with the Governor, DHHS is required to prepare a state plan for each Medicaid program and prepare resource allocation recommendations in the form of waiver amendments submitted to CMS, the federal agency responsible for the administration of the Medicaid program.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP390127

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

23.    In most cases, CMS simply performs a paper review of documents DHHS submits, without conducting on site reviews to determine whether the state is actually in compliance with the Medicaid Act, the Americans with Disabilities Act or the Rehabilitation Act.

24.    DHHS is obligated to establish and administer its Medicaid programs in compliance with the Medicaid Act and all CMS regulations, manuals and policies so as to achieve a health care delivery system that delivers services tailored to the clients' needs in the most cost-effective manner, in the least restrictive setting, as required by the ADA and the Rehabilitation Act.

25.    The Medicaid Act requires DHHS to administer its programs in the best interest of waiver participants and to assure CMS that the health and welfare of waiver participants is being protected, but CMS does not conduct "look behind" studies to determine compliance.

26.    DHHS is charged by the General Assembly and federal law with the duty of assuring the quality of care in Medicaid programs.

27.    The Medicaid Act requires DHHS to administer Medicaid waiver programs in the best interest of the participants and to assure the federal government that the agency is protecting the health and welfare of waiver participants.

28.    **The South Carolina Department of Disabilities and Special Needs (DDSN)** is responsible for providing care and treatment to all persons who have intellectual and related disabilities in the least restrictive setting (whether or not they qualify for Medicaid), pursuant to the South Carolina Intellectual Disability, Related Disabilities, Head Injuries, and Spinal Cord Injuries Act [S.C. Code of Laws Section 44-20-10 et. seq.], the South Carolina Family Support Act [S.C. Code of Laws Section 44-21-10].

29.    DDSN owes a common law duty of care to disabled persons in its programs.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

30.    DDSN is the state's designated authority for administering federal funds allocated to South Carolina for intellectual disability programs and it must comply with the Medicaid Act, the Americans with Disabilities Act and the Rehabilitation Act in spending those funds.

31.    In addition to Medicaid funding, S.C. Code 44-20-20 provides state funding to DDSN to "assist persons with intellectual disabilities, related disabilities, head injuries, or spinal cord injuries by providing services to enable them to participate as valued members of their communities to the maximum extent practical and to live with their families or in family settings in the community in the least restrictive environment available" - whether or not the participant or family receive Medicaid services.

32.    As the agencies responsible for the day to day operation of the ID/RD Medicaid waiver program (under contract with DHHS), DDSN and DHHS both have a duty pursuant to federal law to protect the health and welfare of waiver participants, to establish reasonable standards through the promulgation of regulations, to provide services in the amount, duration and scope necessary in the least restrictive setting and to inform waiver participants and their families of feasible alternatives under the waiver.

33.    DDSN provides services to persons with intellectual disabilities through a network of county Disabilities and Special Needs Boards and members of most of these boards are appointed by the Governor.

34.    In addition to these laws, DDSN has a duty to comply with the Adult Health Care Consent Act.

35.    Instead of promulgating regulations in compliance with this statute, DDSN has published "directives" designed to prevent families of incompetent clients from learning about treatments

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

and health care decisions made by DDSN providers under the guise of not taking "rights" away from intellectually disabled persons.

36.    DDSN and DHHS have protected DSN Boards and their employees who have abused, neglected and exploited persons with intellectual disabilities, in violation of their common law duty of care to those clients and families.

37.    DDSN continues to pay PCDSNB for vacant beds for three months or more after residents of its group homes die or are discharged, spending funds intended to provide services in less restrictive settings.

38.    **The Pickens County Disabilities and Special Needs Board (PCDSNB)** is responsible for the administration, planning and coordination of services for persons with intellectual disabilities and their families and its director is responsible for the review and evaluation of all county disabilities and special needs services in Pickens County. S.C. Code 44-20-20 and 375-385.

39.    As a condition of receiving funds through its contract with DDSN, PCDSNB agreed to provide services in compliance with all applicable state and federal laws.

40.    In addition to its common law duties, PCDSNB also has an obligation under federal law to protect the health and welfare of Medicaid waiver participants.

41.    Approximately 30% of funds paid for ID/RD waiver services come from the South Carolina General Assembly and the remaining 70% are paid by the federal government to DHHS, which distributes those funds to DDSN based on unaudited cost reports DDSN submits to DHHS, and unaudited cost reports which DHHS submits to CMS, the federal Medicaid agency (Centers for Medicare and Medicaid Services).

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

42.    PCDSNB has allowed its employees to sign consents to health care for clients who are unable to consent, in violation of the Adult Health Care Consent Act, and it has repeatedly failed to inform families of injuries and illnesses suffered by residents in its group homes.

43.    PCDSNB obstructed Grate and Valentine from receiving necessary services in the least restrictive setting in order to keep its beds full.

**Individual Defendants**

44.    **Henry D. McMaster** became Governor of the State of South Carolina in February 2017.

45.    Prior to becoming Governor, during McMaster's tenure as Attorney General (2002-2010) and Lieutenant Governor (2015-2017), he became personally aware of systemic abuse, neglect and exploitation in DDSN programs and he had obligations in those positions to protect the health and safety of vulnerable adults like Valentine, including persons residing in DDSN facilities, which he failed to do.

46.    McMaster is sued in both his individual and official capacities.

47.    **Nimrata "Nikki" Haley** served in the South Carolina House of Representatives from 2005 until 2011, and she served as Governor from 2011 until 2017.

48.    As a member of the House of Representatives, Haley had personal knowledge of the conversion of tens of millions of dollars that had been allocated by the General Assembly to provide services to persons and families served by DDSN.

49.    The provider with the then highest rate of abuse, neglect and exploitation of DDSN clients in the state, the Babcock Center, was located in Haley's district.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

50.    As a member of the House of Representative and, later, as Governor, Haley had personal knowledge of the systemic abuse, neglect and exploitation of clients in DDSN programs and she acted with conscious indifference to their needs and their safety.

51.    In 2011, Haley appointed Anthony Keck as director of DHHS, who had extensive experience managing Medicaid programs, in particular programs for persons with intellectual disabilities.

52.    Keck spent three years studying the Medicaid programs administered by DDSN and its local DSN Boards and determined that South Carolina was not in compliance with the Medicaid Act.

53.    In 2014, soon after Keck advised Haley of systemic violations in the DDSN system, including the illegality of the funding system used by DDSN and DHHS, which is not actuarially sound and does not comply with the Medicaid Act, Haley replaced Keck with Christian Soura, who had no prior experience operating or managing Medicaid programs.

54.    Haley also replaced Deborah McPherson, who has extensive experience in the operation of Medicaid programs, with William Danielson to serve on the governing board of DDSN, knowing that Danielson had served as treasurer and finance chairman of the Babcock Center, a corporation located in her former House District.

55.    Danielson operates a company which advises businesses of their obligations to pay payroll taxes, but during his terms as a member of the Board of Directors and an officer of the Babcock Center, that organization failed to pay payroll taxes for 46 weeks.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

56.    Danielson swore allegiance to Governor Haley after Deborah McPherson brought to Haley's attention serious problems related to abuse, neglect and exploitation of vulnerable adults receiving services in DDSN programs.

57.    Haley is sued in her individual capacity.

58.    **Joshua Baker** is the current director of DHHS, having formerly served as deputy chief of staff for budget and policy under Governor Nikki Haley.

59.    When Soura brought Baker to DHHS from Governor Haley's office, he had no prior experience administering Medicaid programs or programs providing services to intellectually disabled persons like Valentine.

60.    When Governor Haley brought **Christian Soura** from Pennsylvania to work full-time as a member of her cabinet, she touted Soura as her "dollar a year" "fix-it man."

61.    Unbeknownst to the General Assembly and the public, Haley, through her private attorney, had secretly established a "nonprofit" thinktank called South Carolinians Transforming Government just in time for Soura's arrival.

62.    South Carolinians Transforming Government paid Soura more than $100,000.00 a year in salary and benefits as the corporation's sole employee.

63.    South Carolinians Transforming Government also paid consulting fees to Marissa Crawford, the Senior Advisor and Director of Legislative Affairs and Special Projects for Governor Haley.

64.    Neither Haley nor Soura ever disclosed the donors who contributed more than $100,000 during the first year of that thinktank's existence.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

65.    When Haley increased Soura's salary to $122,000 a year during his second year of service to the Governor, Haley's private attorney dissolved South Carolinians Transforming Government, with Soura keeping all of the records.

66.    Defendants Soura, Baker, Danielson, Buscemi, Kerr, and Barfield schemed with Haley to obtain an increase of $13.3 million in new, recurring state funds under the false pretext of providing new services to DDSN clients in order to prevent the General Assembly and the public from learning that her cabinet agency had overbilled the federal government more than $10 million during a year when home-based services and reimbursements to DSN Boards were being drastically reduced.

67.    This repayment of federal funds resulted from DDSN and DHHS falsely inflating the cost reports DHHS submitted to the federal Medicaid agency, CMS.

68.    Haley, Danielson, Buscemi, Baker and Soura sold the idea of this drastic increase in funding to DDSN by assuring the General Assembly that those state funds would be matched with federal funds to produce more than $43 million in jobs and services for South Carolinians.

69.    Haley, Soura and Baker and the officials at DDSN and DHHS knew all along that all but $4 million (70% of which were federal matching funds) would be used to repay the debt DHHS owed to the federal government.

70.    Baker has continued the fraudulent practices of his predecessor in office, Christian Soura.

71.    Baker is sued in both his individual and official capacities and Soura is sued in his individual capacity only.

72.    **Robert Kerr** was a CPA and is a former director of DHHS.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

73.     Kerr conspired with Governor Sanford, and later Governor Haley, and agency officials to convert funds allocated to provide services to DDSN clients for other purposes.

74.     When Kerr retired as director of DHHS in 2007, he immediately established a lobbying and consulting firm, **Kerr & Company**.

75.     Within six months of his retirement as director of DHHS, in FY 2008, Kerr contracted with DDSN to perform an "independent" study of its funding system, which had been established when he was a finance officer for DHHS.

76.     This contract was arranged with **William Barfield,** then Deputy State Director of Administration (Finance) for DDSN.

77.     Barfield served as Senior Budget Analyst for DDSN, and later Deputy State Director of Administration in charge of finances until 2009, having worked in the finance division of DDSN for three decades.

78.     Barfield had worked with Kerr, Kathi Lacy and Stanley Butkus to establish the "band funding" system, which has never been approved by the South Carolina General Assembly or CMS.

79.     In FY 2010, DDSN and DHHS fraudulently imposed caps on home-based services, eliminated physical therapy, occupational therapy and speech services from the ID/RD waiver program and reduced rates paid to providers of DDSN services, by falsely informing the governing board of DDSN, CMS and the public that these cuts were unavoidable due to a drastic budget reduction.

80.     Simultaneous with these amendments to the ID/RD waiver program, Barfield retired as director of finance, only after arranging for Kerr to receive a $67,000 one-year contract to conduct

14

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

an "independent" study of the illegal DDSN funding system, which Barfield, Kerr, Lacy and Butkus had concocted.

81.     No other state in the country uses this funding system.

82.     Kerr's "independent" study of the band funding system was actually ghost written by the recently retired Barfield, who secretly received one third of all amounts DDSN paid to Kerr, in violation of the State Ethics Act.

83.     From 2010 until 2017, unbeknownst to the General Assembly, CMS, or even the DDSN Commissioners, DDSN continued to pay Kerr $4,000 a month, in an illegal sole-source arrangement with Buscemi, without knowledge or consent of her governing board, in violation of the state procurement code.

84.     Kerr continued to pass on to Barfield one-third of these illegal payments after the one-year contract was ended.

85.      Kerr and Barfield are sued in their individual capacities, as is **Kerr & Company.**

86.     For many years, Barfield had knowingly submitted false and inflated federal cost reports to DHHS, knowing that DHHS would transmit those inflated cost reports to the federal government.

87.     Also, immediately upon his "retirement" from DDSN, Barfield accepted employment from Long's Pharmacy, personally profiting from his government position by using his influence to cause local DSN Boards to transfer pharmaceutical services to Long's, without notice to or the consent of waiver participants' health care representatives.

88.     Valentine's pharmaceutical services were transferred to Long's without notice to or consent from her family and Valentine's family was never informed of medication reviews.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

89.    Barfield was well aware of the requirement to obtain consent from representatives who were authorized under the Adult Health Care Consent Act to select the provider of pharmacy services for waiver participants and his company failed to inform those representatives of their rights to participate in periodic medication reviews or of repeated medication errors.

90.    Instead, Valentine attended these reviews alone and signed consent forms, unbeknownst to her family.

91.    Barfield is sued in his individual capacity.

92.    Governor Haley hired **Patrick Maley** as her third Inspector General in 2012, a position he held until Haley resigned as Governor in 2017.

93.    Maley had no prior experience operating Medicaid programs, but he became well aware of the fraud, mismanagement and corruption in DDSN programs in conducting investigations of state and local DDSN service providers, including allegations of fraudulent and negligent misappropriation of funds, abuse, neglect and exploitation in DDSN programs.

94.    As Haley's Inspector General, Maley whitewashed reports of abuse, neglect, exploitation of DDSN clients and the misuse of federal and state funds in order to protect Haley and Buscemi.

95.    When Haley resigned as Governor, DDSN director Buscemi immediately hired Maley to once again study DDSN's noncompliant funding system, which Kerr and Barfield were also simultaneously being paid to study.

96.    Despite the United States Department of Health and Human Services Office of Inspector General (US DHHS OIG) and the South Carolina Legislative Audit Council (LAC) and former DHHS Director determining that this band funding system failed to provide accountability, after

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

Haley replaced Keck with Soura, no effort was made before Valentine's untimely death to replace the band system with a compliant funding system.

97.　　Maley was promoted to interim director of DDSN upon Buscemi's resignation as director of DDSN, and he served in that capacity until September 2018.

98.　　As interim director, instead of requiring DDSN to comply with the Medicaid Act, the ADA and the Rehabilitation Act, Maley just kicked the can further down the road by conducting additional studies and assuring legislators and the public that there was no crisis at DDSN, as the rates of abuse and neglect in DDSN programs continued to rise.

99.　　When a permanent director of DDSN was hired in 2018, Maley was named Deputy Director of DDSH.

100.　　Maley is sued in his official and individual capacity.

101.　　**Sam Waldrep** was a Deputy Director of DHHS responsible for the administration of long-term care services, including the Medicaid waivers administered by DHHS and later served as a Senior Advisor to the director of DHHS.

102.　　Waldrep joined with Butkus, Barfield, Waring, Lacy and Mole in concocting a scheme to falsely inform CMS, the DHHS Medical Review Committee and thousands of Medicaid waiver participants and their struggling families in 2010 that imposing caps and reductions on home-based services was necessary because of budget reductions.

103.　　That year, however, DHHS failed to spend $225 million allocated for Medicaid services and he participated in the preparation of the waiver application that actually increased the per capita cost of the waiver program from $37,000 to $51,000 and increased the total cost of the program by more than $50 million.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE #2018CP3901274

104.    Waldrep was personally involved in ongoing reductions and limitations in home-based services after these initial reductions to assure that DDSN's beds and workshops were kept full, in violation of the integration mandate of the ADA.

105.    Waldrep is sued in his individual capacity.

105.    **Beverly Buscemi** served as Director of DDSN from 2010 until 2017.

106.    During Buscemi's tenure at DDSN, the abuse, neglect and exploitation of clients increased, and she conspired with others to submit false and inflated claims to the federal government.

107.    Buscemi failed to take reasonable precautions to protect DDSN clients from abuse, neglect and exploitation in violation of DDSN's duty of care to DDSN clients.

108.    Buscemi approved contracts far in excess of the limits set by her governing board and she was responsible for continuing the illegal payments to Kerr & Company, knowing that these sole-source agreements and other sole-source contracts violated the state procurement code.

109.    Buscemi increased by $1.6 million the amount paid to Mentor, Inc., a private corporation with extremely high rates of abuse and neglect, without notice to or authorization from her governing board, nor did Buscemi inform the DDSN Commissioners of the real causes of death and abuse of Mentor clients.

110.    Buscemi obtained DDSN Commissioners' approval to conduct a pilot study using Therap, a private electronic records company, but failed to obtain the Commission's authorization or to comply with the state procurement code when DDSN awarded a multi-million-dollar contract to implement Therap state wide.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

111.    Buscemi approved the expenditure of millions of dollars that had been allocated by the General Assembly to provide services to waiver participants to purchase and upfit large congregate workshops and group homes across the state without legislative authorization.

112.    Buscemi "loaned" millions of dollars to DSN boards in financial trouble, without authorization from the DDSN Commission or the General Assembly.

113.    Buscemi caused more than a million dollars to be spent in 2017 and 2018 creating a new division at DDSN called the "Waiver Administration Division" or "WAD," without notice to or authorization from her governing board or the General Assembly.

114.    This division was created to systemically reduce hours provided to DDSN clients who live at home, without consideration of medical consequences or a cost analysis, and without consulting the affected client's treating physicians.

115.    Buscemi conspired with Kerr, Barfield, Stanley Butkus, Kathi Lacy, Susan Beck, Tom Waring and others to divert funds that the General Assembly and CMS intended to provide services in the least restrictive setting to be used for other purposes not authorized by the legislature.

116.    Buscemi was consciously indifferent to the needs of Valentine and other DDSN clients and families of DDSN clients who needed increased services and funds to live in the least restrictive setting.

117.    In the year before Buscemi resigned as director of DDSN, she increased key staff's salaries by as much as 30% without notice to or authorization from her governing board.

118.    In the months before her resignation as director of DDSN, without notice to or approval from the DDSN Commissioners, Buscemi increased the contract with Community Options, Inc.,

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

by millions of dollars while negotiating an employment contract with that private out-of-state corporation.

119.   Immediately upon retirement from DDSN, Buscemi accepted employment from Community Options, in violation of the state Ethics Act.

120.   Buscemi misused her office for personal gain and she is sued in her individual capacity.

121.   **Mary Poole** became director of DDSN in September 2018 and she previously served as director of a DSN board, where she challenged the legality of the band funding system.

122.   At this time, Poole is sued in her official capacity.

123.   **Kathi Lacy** served as Associate State Director of DDSN until her retirement in 2014, when she began providing services under various consulting contracts with DDSN and its agents.

124.   Lacy conspired with others to establish and maintain the illegal band funding system and to illegally restrict access to home-based services.

125.   Lacy was responsible for tracking incidents of abuse, neglect and exploitation and reporting trends and serious incidents to the director of DDSN and she was responsible for covering up abuse, neglect and exploitation in DDSN programs.

126.   Lacy schemed with Butkus, Barfield, Kerr, Buscemi, the Office of the Governor and others to make the governing board of DDSN and the public believe that services were capped due to budget deficits and directives from CMS in order to illegally limit home-based services.

127.   Lacy's division was responsible for informing clients and families of DDSN client's feasible alternatives under the waiver programs, but she persistently adopted and enforced illegal binding norms that violated the ADA, the Rehabilitation Act, the Medicaid Act, state statutes and court orders requiring services to be provided in the least restrictive settings.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

128.    Lacy is sued in her individual capacity.

129.    **Susan Beck** was hired by Buscemi as Associate State Director of DDSN when Lacy "retired" in 2014, assuming the responsibilities of tracking abuse, neglect and exploitation of clients, assessing needs for services and establishing budgets for DDSN clients.

130.    Beck conspired with other Defendants to fraudulently convert funds allocated by the General Assembly to provide services in the least restrictive setting to other purposes, in complete disregard for the rights of DDSN clients under the ADA and the Rehabilitation Act, or the medical consequences to DDSN clients, all for financial gain of herself, contractors and the agencies.

131.    After Beck assumed responsibilities as Associate Director of DDSN, the rates of abuse, neglect and exploitation of DDSN clients continued to rise.

132.    Beck has willingly and knowingly disregarded the orders of the Fourth Circuit Court of Appeals in regard to the Medicaid Act's reasonable promptness mandate and the South Carolina Court of Appeals in regard to the agency's violations of the ADA in regard to continuing to impose arbitrary caps on services and to deny requests in excess of the caps.

133.    Without the required authorization from the DDSN Commission, Beck and Buscemi spent more than $1 million to establish and operate the "Waiver Administration Division" in 2017, a division that was designed to systemically reduce services provided to waiver participants living at home, without establishing reasonable eligibility standards for determining how many attendant and respite hours are awarded to DDSN clients.

134.    For decades, DDSN has refused to promulgate regulations, as required by the S.C. Code and the South Carolina Administrative Procedures Act.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

135.    Beck, Lacy and Buscemi conspired with DHHS to establish arbitrary standards which have been imposed as binding norms, without promulgation of regulations to drastically decrease services provided to the most vulnerable citizens of South Carolina and their families.

136.    Beck is sued in both her official and individual capacities.

137.    **Thomas Waring** succeeded William Barfield as Associate State Director of DDSN in 2009, having worked for the agency for decades.

138.    Waring conspired with Barfield, Butkus, Kerr, Buscemi, Lacy, Beck and others to convert funds that the General Assembly had allocated to provide services in the least restrictive setting for other purposes.

139.    Waring acted with conscious indifference to the needs of DDSN clients who required more services to prevent institutionalization, thus forcing DDSN clients into unsafe and chronically understaffed DDSN facilities because adequate supports and services were not provided in the least restrictive setting, in violation of the ADA, the Rehabilitation Act, the Medicaid Act and state statutes.

140.    Waring knowingly prepared inflated budgets to be approved by the General Assembly, with full knowledge that the agency did not plan to spend those funds during the fiscal year to provide services and to protect the health and welfare of waiver participants, instead intending to spend those funds for purposes unauthorized by the General Assembly in following years.

141.    Waring retired from DDSN in 2018 and he is sued in his individual capacity.

142.    **Stanley Butkus** was the director of DDSN from 1997 until 2009.

143.    Butkus conspired with Lacy, Barfield, Kerr, Waring, Buscemi, the Office of the Governor and others to establish binding norms, without promulgation of regulations, and to establish and

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

continue the illegal band funding system which funded congregate and segregated facilities with funds allocated by the General Assembly that were intended to provide supports and services families needed to keep their loved ones at home.

144.    Butkus and others conspired with the Governor's Office to cap and reduce services under false pretenses of budget reductions in the months prior to his resignation.

145.    Butkus knew of and consciously failed to protect the health and safety of clients when he converted funds that the General Assembly had allocated to provide services in the least restrictive setting to other purposes.

146.    After retiring as director of DDSN under pressure, Butkus left the state, but he returned a few years later as director of Mentor, Inc., a provider of DDSN residential services.

147.    As director of Mentor, Butkus continued to conspire with DDSN and DHHS officials to convert funds allocated to provide services in the least restrictive setting to benefit himself and his for-profit company.

148.    As a result of funds being improperly diverted to Mentor, Inc., funds intended to provide services to persons living in their own homes were diverted.

149.    As director of DDSN, Butkus had knowledge of the systemic abuse, neglect and exploitation of clients in residential facilities and congregate day programs funded by DDSN, but he failed to take necessary steps to protect residents of group homes and persons attending DDSN funded day programs, like Valentine, from harm or to promulgate regulations to carry out the obligations of his office, the ADA, the Rehabilitation Act and the Medicaid Act.

150.    Butkus is sued in his individual capacity.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

151.    **Lois Park Mole** was DDSN's liaison with the General Assembly and she was assigned by Butkus, then Buscemi, to communicate with families whose loved ones were injured, abused, neglected or exploited in DDSN facilities.

152.    While Valentine was living in PCDSNB facilities, Mole acted as a paid lobbyist for DDSN, misleading legislators about how funds allocated for services would be used.

153.    Mole conspired with other DDSN officials, Kerr, Barfield and the Governor's Office to convert funds allocated to provide services in the least restrictive setting for other purposes.

154.    Mole lobbied to have the Adult Health Care Consent Act amended in order to give DDSN priority over families to make health care decisions for DDSN clients, without authorization or approval of the governing board of DDSN or notice to the public.

155.    Mole had knowledge of the high rates of abuse, neglect and exploitation of DDSN clients, but failed to take action to protect them from harm and actively misled legislators and covered up the extent of abuse and neglect in DDSN congregate settings.

156.    Mole is sued in both her official and individual capacities.

157.    **William Danielson** owns a company that provides payroll services to businesses and he was paid to locate real estate for providers of DDSN services, which were purchased with funds allocated by the General Assembly, not to buy or improve real estate, but to provide services to DDSN clients in the least restrictive setting.

158.    Danielson served as treasurer of the Babcock Center, the largest private provider of DDSN services, when that corporation that is treated by DDSN as a local DSN Board was on the verge of bankruptcy due to the explosive amount of abuse, neglect and exploitation in its facilities.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

159.   When Danielson was treasurer of the Babcock Center, that corporation withheld employment taxes from employees' checks for 46 weeks but failed to pay not only its own share of employment taxes, but also to pay over the employees' share (already withheld from the employees' paychecks) to the Internal Revenue Service.

160.   Danielson conspired with Buscemi, Haley, Barfield and others to convert funds that had been allocated by the General Assembly and the federal government to provide services to instead purchase an administration building, workshops and group homes for the Babcock Center and to pay that private corporation's and local DSN Boards' debts and tax liabilities, thereby causing South Carolina to lose millions of dollars in federal matching funds.

161.   Danielson caused Babcock Center to illegally use state and federal funds to litigate an unsuccessful action in federal court attempting to recoup interest and penalties after willfully collecting and failing to pay payroll taxes to the federal government.

162.   While litigation was pending in *Babcock Center v. United States*, Governor Haley appointed Danielson to the governing board of DDSN in 2014 and, shortly thereafter, Danielson was elected as Chairman of the DDSN Commission in an election that did not comport with the agency's policies.

163.   As Chairman of the DDSN Commission, Danielson acted negligently in failing to investigate reports of abuse, neglect and exploitation of clients and failed to monitor litigation so as to prevent harm to DDSN clients.

164.   Danielson's blind loyalty to the Governor and Buscemi prevented him from acting in the best interest of DDSN clients, in violation of his duty of care.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

165.    Danielson knowingly failed to monitor abuse, neglect and exploitation of DDSN clients, and failed to implement the orders of the Fourth Circuit and the South Carolina Court of Appeals in regard to the promptness of delivering services and the continued application of arbitrary caps on home-based services in violation of the ADA.

166.    Danielson violated his common law duty of care and statutory obligations to Valentine and others and he is sued in his individual capacity.

167.    **Elaine Thena** is the Director of the Pickens County Disabilities and Special Needs Board (PCDSNB).

168.    Thena failed to provide supervision and monitoring and to protect the health and safety of clients at PCDSNB, including Valentine in violation of her common law duty of care and statutory obligations to waiver participants deriving from state and federal law.

169.    Thena conspired with others to fraudulently convert tens of thousands of dollars that were allocated by the General Assembly to provide services to DDSN waiver participants to a private religious college for the construction of a dormitory, thereby losing matching federal funds.

170.    Thena illegally diverted these funds, in violation of the South Carolina Constitution, while leaving her residential programs seriously understaffed and her staff poorly trained.

171.    Under Thena's leadership, PCDSNB clients who have the mental capacity of young children signed "releases" and "consents" to receive health care services, without contacting the family members whose consent to health care is mandated by the South Carolina Adult Health Care Consent Act to prevent families from learning of the dangerous conditions in the group homes and workshops she supervised.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

172.    Thena and PCDSNB allowed these staff members to sign health care consents and discharge papers knowing that authorized family members were not made aware of injuries, dangerous conditions and illnesses.

173.    Thena and PCDSNB knew that PCDSNB employees failed to inform PCDSNB clients and their families of feasible alternatives to choose services and their right to choose to use private case managers in order to force DDSN clients into more profitable, but unsafe, residential and day programs.

174.    Thena, PCDSNB and other Defendants profited by failing to inform PCDSNB clients and their families of feasible alternatives to receive personal care attendant, nursing and respite services in their homes, and by failing to inform waiver participants representatives of services in excess of the caps imposed by DDSN and DHHS in 2010.

175.    Thena allowed untrained PCDSNB staff members (or staff members whose certification had expired) to administer medications which resulted in medication errors that caused injury and suffering to Valentine.

176.    Thena helped obstruct the criminal prosecution of staff members who harmed Valentine and failed to report abuse, neglect and exploitation.

177.    Thena is sued in her official and individual capacities.

178.    **John Owens** is the Assistant Director at the Pickens County Disabilities and Special Needs Board (PCDSNB).

179.    Owens conspired with others to fraudulently convert funds allocated by the General Assembly to provide services in the least restrictive setting, and he acted with conscious

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

indifference to the needs of the Plaintiffs, with knowledge of the systemic abuse and neglect in PCDSNB's residential and day programs.

180.    Owens informed law enforcement that Anderson's assault of Valentine was due to understaffing at the PCDSNB, because the staff was "under a lot of stress" because 31 positions were unfilled.

181.    Owens failed to supervise and monitor employees and to properly investigate claims of abuse, neglect and exploitation of residents and participants in PCDSNB programs in violation of his duty of care to protect residents from harm, and he failed to inform Grate of feasible alternatives under the waiver program, which were needed to allow Valentine to receive services in the least restrictive setting.

182.    Owens joined with others to retaliate against Debra Grate when she complained that Valentine had been burned with a cigarette and she later attempted to remove her sister from the PCDSNB. Owens knew that family members of persons served in DDSN programs were not being informed about illnesses, injuries and dangerous conditions and he failed to require that the PCDSNB comply with the Adult Health Care Consent Act and HIPAA.

183.    Owens attempted to thwart Grate's removal of Valentine from dangerous conditions in retaliation for Grate making reports to law enforcement.

184.    Owens is sued in both his official and individual capacities.

185.    **Diane Anderson** was the house manager at Jewel CTH II ("Jewel"), where she consciously abused, neglected and exploited Valentine and failed to report abuse, neglect and exploitation to proper authorities.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

186.    Anderson failed to inform Grate of Valentine's health care conditions, illnesses and injuries and she illegally signed consent forms and discharge papers without notifying family members with authorization to make health care decisions for Valentine.

187.    Anderson psychologically and physically abused and assaulted Valentine, a vulnerable adult to whom she owed a duty of care.

188.    Anderson joined with Owens and others in retaliating against Grate and obstructing Valentine's release from Jewel CTH II.

189.    Anderson is sued in her official and individual capacities.

**Latoya Nichole Valentine Background**

190.    As a profoundly intellectually disabled person with the mental capacity of a two to four-year-old child, living in a group home operated by state actors, Valentine was a member of a discrete and well-defined class of intellectually disabled persons who have historically been subjected to unequal treatment, discrimination, abuse, neglect and exploitation in programs operated by DHHS, DDSN and local DSN Boards.

191.    From 1994 until 2017, Valentine received services through a home and community-based Medicaid waiver program administered by the South Carolina Department of Disabilities and Special Needs (DDSN) under contract with the South Carolina Department of Health and Human Services (DHHS).

192.    To qualify for the ID/RD Medicaid waiver program (formerly MR/RD), all participants must meet institutional level of care, so that DHHS determines that they qualify to receive government funded services in institutions, but instead chose to receive services in the community in the amount, duration and scope necessary to protect their health and welfare.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

193.    The Oconee County DSN Board provided services in Valentine's own home from 1994 to 1997.

194.    Valentine's father left the family home when she was a teenager, leaving her mother, Dorothy Ruth Valentine, and her sister, Debra Grate, to support Valentine and to provide supervision at all times except when she was at school.

195.    Dorothy Ruth Valentine died in 1995, leaving Grate, a working mother with her own children to support and care for Valentine, who was then eighteen years old.

196.    DDSN and PCDSNB failed to provide the services and supports Valentine needed to remain in her family home in violation of the South Carolina Family Support Act, thereby forcing her into a group home funded and monitored by DDSN and DHHS.

197.    When Grate's third child was born, and Grate had to return to work in 1997, DDSN placed Valentine in a costlier institutional setting called an ICF/MR (now called an ICF/ID), an intermediate care facility operated by the Pickens County DSN Board (PCDSNB).

198.    The Health Insurance Portability and Accountability Act (HIPAA) and the South Carolina Adult Health Care Consent Act at S.C. Code of Laws 44-66-10 determine the identity of the person (referred to herein as Valentine's "representative") who has authority to make health care decisions for an adult, like Valentine, who does not have capacity to consent.

199.    PCDSNB failed to inform Valentine's authorized representative of injuries and illnesses and failed to obtain consents from her representative, as required by the Adult Health Care Consent Act in violation of its duty of care to its residents.

200.    Valentine was unhappy in the PCDSNB facility, and in 2003, she declared that "I want to go live with my sister."

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

201.    During the next decade, DDSN and PCDSNB never informed Valentine's representative of the feasible alternative of Valentine receiving supports that would allow her to return home to live with her family, instead having Valentine herself sign "freedom of choice" forms "choosing" the PCDSNB as her provider of Medicaid waiver services and having her sign consent forms to residential, day program and medical treatments.

202.    The Defendants failed to inform Valentine's representative that the Medicaid waiver provides for family members to be paid to provide personal care services in the family's home, which would have allowed Valentine to avoid injuries suffered at Jewel CTH II.

203.    From 1997 until 2017, PCDSNB conducted annual plan meetings and called team meetings without notice to Valentine's representative and never included her representative in the mandatory quarterly medication review meetings led by Dr. Bamashmus, the psychiatrist under contract with the PCDSNB.

204.    In 2004, without consent from Valentine's representative under the Adult Health Care Consent Act, or providing any other choices, DDSN and PCDSNB Defendants moved Valentine from the ICF/MR to a group home operated by the PCDSNB, where Valentine received services funded by DDSN and DHHS until 2005.

205.    In 2005, again without consent from Valentine's representative, DDSN and PCDSNB Defendants moved Valentine to a different group home called "Jewel CTH II," where she suffered systemic abuse, neglect and financial exploitation for the next twelve years.

206.    The house manager, Diane Anderson and other staff at PCDSNB illegally signed consents to medical care provided to Valentine which the Adult Care Consent Act required her representative to sign.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

207.   In other cases, PCDSNB caused Valentine herself to sign consents to medical treatment, despite her having the mental capacity of a young child.

208.   On January 8, 2016, PCDSNB wrote that "Nickie was offered other health care providers but she says she likes the Healthcare Providers she currently has. She makes her own decisions (with help from staff) for her appointments and providers."

209.   PCDSNB reported that "Due Process was explained and obtained with Nickie's acknowledgment and consent given on December 11, 2015 for her Human Rights Meeting on December 10, 2015," despite having knowledge that Valentine had the mental capacity of a pre-school child.

210.   Although PCDSNB determined that Valentine was competent to make health care decisions and to approve her plan of care which resulted in tens of thousands of dollars a year being paid to ACDSNB, the board determined that "Nickie does not have, nor does she understand financial needs."

211.   Every year, PCDSNB presented forms to Valentine to sign "choosing" to receive residential and day program services from the PCDSNB, without notice to her representative of the feasible alternatives and without sending copies of her plan of care to any family member.

212.   PCDSNB also caused Valentine to sign forms "choosing" to use its own physicians, behavior support providers and the psychiatrist working under contract with the PCDSNB.

213.   Valentine did not demonstrate aggression at home, but she was constantly written up by PCDSNB staff for physical aggression and noncompliance at Jewel, where she was being physically and psychologically abused.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

214.   PCDSNB failed to inform Valentine's representative of her right to receive services in the least restrictive setting, to choose her providers of health care services or to be paid for providing services to Valentine in her family home.

215.   In 2005 and 2010, PCDSNB listed Valentine's aunt, Margaret Cunningham, who had no authority to act under the Adult Health Care Consent Act, as her family "contact."

216.   On August 26, 2010 and again on March 15, 2012 Debra Grate was identified on hospital records as Valentine's emergency contact.

217.   But Diane Anderson informed the hospital that she was Valentine's "next of kin" and Grate was not informed of her sister's hospitalization in 2010.

218.   PCDSNB failed to notify Valentine's authorized representative of medication reviews, injuries and illnesses, which included, but may not have been limited to:

    a.    quarterly medication reviews led by PCDSNB's psychiatrist and periodic "human rights" reviews by the PCDSNB Human Rights Committee;

    b.    annual plan meetings where it was determined what services Valentine would receive and who would provide those services;

    c.    Valentine being brought into the emergency room on a stretcher, drooling, with low sodium levels in an "altered mental state" on July 26, 2010, and it was reported that she was a danger to herself or others and records indicated "occasional" prior incidents;

    d.    Valentine's sodium level was in the dangerously low "110 range" on March 14, 2012 and she was taken to the emergency room and hospitalized until March 17, 2012, where Diane Anderson signed forms claiming to be Valentine's health care "representative";

33

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

e.      Valentine was taken to the emergency room for an overdose, brought in on a stretcher after being given the wrong medication on February 9, 2013 and having low sodium levels;

f.      on February 15, 2013, Valentine was taken to the emergency room for "accidental drug ingestion" after staff administered another client's medication to Valentine;

g.      on March 6, 2013, Valentine was taken to the emergency room, where she was treated for cough and congestion;

h.      on March 12, 2013, Valentine was taken to the doctor for a follow up visit;

i.      on April 3, 2013, Valentine was bitten on her left hand by another client and treated in the emergency room;

j.      Valentine was treated for low sodium levels on May 14, 2013;

k.      Valentine was diagnosed with gall stones after presenting with abdominal pain in June, 2013;

l.      Valentine was treated for gall stones on December 27, 2013;

m.      low sodium levels were reported on January 27 and 31 and June 11, 2014;

n.      Valentine was given the wrong medication on April 17, 2014;

o.      on September 12 and 25 and December 10, 2014, Valentine was treated for "becoming violent";

p.      Valentine was treated for a human bite inflicted by another client on May 21, 2015;

q.      Valentine received treatment in the emergency room for an injury to her foot on June 17-18.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

     r.       on June 7, 2015, a client grabbed Valentine by her shirt and scratched her, spilling coffee on her;

     s.       on June 17, 2015, Valentine was treated for "pain and bruising" on her foot and an x-ray was taken due to "foot pain and swelling";

     t.       on July 2, 2015 Valentine's foot was x-rayed;

     u.       Valentine was "pushed hard by a consumer" on January 13, 2016;

     v.       on March 12 and 13, 2016, Valentine was written up for eating hamburger from the refrigerator, but the report does not mention whether the meat was cooked or raw;

     w.       Valentine was treated in the emergency room on March 28, 2016 for "altered mental status," frequent falling, confusion, drooling and mumbling after PCDSNB appears to have given her the wrong medications;

     x.       a follow up visit with the treating physician occurred on April 4, 2016, following the emergency room visit that had occurred on March 28, 2016;

     y.       a medication error was recorded on April 17, 2016;

     z.       on April 19, 2016, Valentine's finger was injured;

     aa.     physician appointment on April 26, 2016, where staff indicated that the chest wound was noticed 1 ½ weeks ago, when Valentine returned from the workshop;

     bb.     an emergency room visit occurred on or about May 26, 2016;

     cc.     a medication error was recorded on July 3-4, 2016 due to "carelessness";

     dd.     an unexplained bruise was discovered on Valentine's "left butt cheek" while staff was giving her a shower on July 18, 2016 and the bruise was still present ten days later;

     ee.     on July 22, 25 and 26, Valentine was written up for refusing to return to Jewel;

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

    ff.     on August 21, 2016, another client sat on Valentine and grabbed her by the neck;

    gg.    Valentine was hit by another client and treated for another human bite on August 27, 2017 and the PCDSNB caregiver who brought Valentine to the emergency room told the hospital staff that "we just need a statement saying she isn't going to die."  PCDSNB and Diane Anderson listed Valentine's aunt, who had no authority under the Adult Health Care Act, as her "emergency contact," but there is no indication in medical records that even the aunt was contacted;

    hh.    a bite mark injury that did not heal until September 5 and a follow up visit was made on September 9, 2016;

    ii.    on October 18, 2016 at 6:40 a.m., another client pulled Valentine's hair;

    jj.    an illness or injury was recorded that required nursing intervention on October 27, 2016;

    kk.    Valentine was treated on October 27, 2016 for an unexplained injury or illness;

    ll.    on November 4, 2016, an unexplained bruise was found on Valentine's thigh;

    mm.    on November 22, 2016, staff discovered two unexplained bruises on both of Valentine's legs;

    nn.    staff reported unexplained scratches below Valentine's knee while showering on November 28, 2016;

    oo.    Valentine was treated by podiatrist for fungal toenails and foot pain that was "aggravated by walking and standing" on March 24, 2017, yet PCDSNB staff continued to require Valentine to walk around the asphalt track at the workshop as a training "goal";

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

pp.    therapy to stretch Valentine's Achilles' tendon was ordered twice daily on March 24, 2017, but physical therapy had been discontinued based on DDSN and DHHS' false claims of budget reductions in 2010 and there is no indication in records that this therapy was provided;

qq.    Valentine was treated for an unexplained injury to her finger on February 5, 2017;

rr.    Valentine was physically restrained by staff on February 14, 2017;

ss.    PCDSNB alleged "self-injury," when Valentine threw herself to the floor on February 15, 2017;

tt.    Valentine allegedly knocked a male client to the ground on February 16, 2017;

uu.    On March 10, 2017, Valentine was crying and refusing to leave the Huddle House to return to the group home, begging to call her sister.

219.    Incident reports were routinely sent to DDSN, but Valentine's representative under the Adult Health Care Consent Act was not informed about these injuries and illnesses.

220.    Grate discovered a wound that appeared to be a cigarette burn on Valentine's chest on April 21, 2016, when she picked her up for a weekend visit and took her to the emergency room for evaluation.

221.    On March 31, 2017, Anderson psychologically abused Valentine by making derogatory comments about her family, then ordering Valentine into the shower.

222.    When Valentine begged Anderson to allow her to call Grate, Anderson grabbed Valentine by her hair, and forced her head down between her legs, making her even more fearful of physical harm.

223.    Anderson then forced Valentine into the bathroom, by grabbing her hair at the back of her head and holding Valentine's arms behind her back.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

224.    When Valentine refused to undress, Anderson slapped Valentine across her face so hard that the employee in another room heard the impact.

225.    The other employee found Valentine with a handprint across her face and caused a report to be made to the SLED Special Victims Unit.

226.    Instead of calling Grate, Anderson and PCDSNB violated Valentine's equal protection rights by falsely informing law enforcement that another relative was her next of kin, then telling law enforcement that Valentine's family was not responsive to the report.

227.    John Owens consciously disregarded Valentine's right to equal protection when he justified Anderson's assault by telling the investigator that PCDSN was "operating 31 positions down causing all staff to work overtime in less than ideal conditions."

228.    Defendants, including present and former officials at DDSN, DHHS and the Governor's Office were aware that DDSN facilities were and continue to be severely understaffed and that certain DDSN providers have consciously disregarded the rights of clients to live in safe, less restrictive settings at home with their families.

229.    Instead of vigorously prosecuting the case, in defense of Defendant Anderson, Defendant Owens reported to law enforcement that "a lot of the staff is stressed."

230.    Upon information and belief, with the knowledge of its director and Owens, PCDSNB assisted Anderson by protecting her from being convicted of a crime against a vulnerable adult by supporting her request to enter a diversion program, thus allowing her to be rehired in a job supervising vulnerable adults and sending a message to other caregivers that they will not be convicted when DDSN clients are abused or neglected.

231.   Despite severe understaffing in PCDSNB and other DDSN facilities, in 2017, Buscemi, Waring and Thera and others spent more than $350,000 that had been allocated by the General Assembly to provide services instead to fund the construction of a dormitory on property owned by a religious school, without notice to or permission from the governing board of DDSN, in violation of the South Carolina Constitution.

232.   In an attempt to obstruct Valentine's discharge from PCDSNB, and in retaliation for Grate's advocacy for Valentine and challenge to PCDSNB's practices, on April 13, 2017, John Owens threatened to terminate her Medicaid waiver eligibility.

233.   Owens and other PCDSNB Defendants knew that Grate and Valentine were entitled to receive home-based services, but failed to inform them of the feasible alternatives, which included Grate being paid to provide personal care services at home.

234.   Owens and other PCDSNB employees failed to inform Grate of Valentine's right to receive case management and other services from different qualified providers.

235.   When Grate was finally able to remove Valentine from Jewel CTH II, instead of refunding Valentine's checking balance to pay for her care in Grate's home, Owens informed Grate that funds in Valentine's checking account would be returned to the Social Security Administration, leaving her without any funds for support, without turning over even the paltry funds Valentine had earned working in the PCDSNB workshop.

236.   Defendants caused Valentine and others across the state to be chemically restrained with psychotropic and/or narcotic medications used to control their behaviors in DDSN residential programs, instead of providing safe homes, reasonable goals in her plan of care and appropriate treatment.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

237.    While Valentine was decompensating, the DDSN and DHHS Defendants took actions which deprived waiver participants of needed behavior supports and psychological services and deprived waiver participants of free choice of providers.

238.    In 2014, the South Carolina Court of Appeals ruled in *Stogsdill v. DHHS* that imposition of caps on services violated the Americans with Disabilities Act (ADA) and that persons like Valentine, who were at risk of institutionalization must be provided services disregarding the caps and limitations established in 2010.

239.    Despite knowing that the caps on services violate the ADA, neither the Governor's Office (Haley, Soura or Baker) nor the agency Defendants changed their policies or practices to require state actors to come into compliance with this ruling.

240.    None of the Defendants even requested funds from the General Assembly to provide additional services in excess of the caps pursuant to *Stogsdill v. DHHS,* and they have failed to use new funding for the purposes allocated by the General Assembly.

241.    Defendants have ignored or have been consciously indifferent to the needs of persons like Valentine who could live at home safely if services in excess of the caps were provided.

242.    PCDSNB charged Valentine $585 a month for room and board, in addition to her food stamps, although she lived in a donated house with three other women and was required to share a room.

243.    PCDSNB acknowledged that Valentine was incapable of making financial decisions or managing her money but failed to obtain consent from Valentine's family or the probate court to charge her for room and board and other services.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

244.    In 2015, Valentine's sister repeatedly complained to Owens and the PCDSNB about Valentine's poor hygiene and unexplained injuries, and all of the Defendants had long known of the failure to provide safe residential and day program services in DDSN and DHHS funded programs, in violation of their duties of care.

245.    PCDSNB and other Defendants continued to ignore their obligations under the Adult Health Care Consent Act and HIPAA to obtain informed consent from Grate for Valentine's plans of care and other medical treatments.

246.    Valentine was subjected to workplace violence that no person who does not have disabilities would be expected to tolerate and Grate was not informed of injuries which her sister suffered at the PCDSNB workshop.

247.    Anderson and other PCDSNB employees forced Valentine to walk around an asphalt track at the workshop for "exercise," which caused her tremendous pain.

248.    Valentine was treated for onychomycotic nails, bilateral lesions on the balls of her feet, with aching pain which was "aggravated by walking and standing," ankle equinus deformity and "painful thick toenails that hurt when walking" from fungus resulting from unsanitary conditions and a "knot on the top of her right foot" caused by neglect and supervisory neglect of the Defendants.

249.    Upon information and belief, DDSN illegally diverted funds intended to provide services in the least restrictive settings to build these segregated walking trails at workshops across the state.

250.    Defendants Thena and Owens failed to supervise their employees to assure that appropriate treatment goals were included in the plans of care of Valentine and other residents.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

251.   Valentine was actually taken to the emergency room in 2016 with bruises on her feet, but Defendants kept the goal of walking around the track on her plan of care, requiring her to painfully navigate the trail and failed to inform Grate of these injuries.

252.   This created a vicious cycle of Valentine responding violently in response to that pain, since she was unable to verbalize and report this abuse to authorities.

253.   Defendants responded to Valentine's behaviors by chemically restraining her with more drugs provided by Long's Pharmacy that were prescribed by PCDSNB's psychiatrist, without the consent of an authorized family member.

254.   Defendant Barfield profited not only from his official position as Deputy Director of DDSN through the contract he arranged with Kerr & Company, but also from the widespread chemical restraint of DDSN clients through his contract with Long's pharmacy.

255.   Barfield, Kerr and Buscemi used their public office for personal gain. When Grate took Valentine to the emergency room to treat the chest wound which appeared to have been caused by a cigarette burn, Owens retaliated by initiating an inquiry into who Valentine slept with at Grate's home, informing Anderson that it was important "in our review" of the allegation of being burned by a cigarette, an injury which occurred at the PCDSNB workshop.

256.   So as to keep Valentine's representative from knowing about the abuse and neglect she suffered at Jewel CTH II, Defendant Anderson told other health care providers that she was Valentine's next of kin and signed consents and releases, attempting to prevent Grate from learning of the pattern of injuries and illnesses indicative of abuse and neglect.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

257.    At other times, Anderson would tell health care providers that Valentine's aunt, who had no authority under the Adult Health Care Consent Act, was the family member with authority to make decisions.

258.    Defendants established a culture at PCDSNB and other facilities where caregivers who witnessed abuse, neglect and exploitation of clients were fearful of reporting it.

259.    Jewel CTH II was purchased with taxpayer funds, but clients placed there were charged more than fair market value in room and board without having any family member review the amounts charged or how Valentine's money was being spent.

260.    As Haley's inspector general, Maley reported that DSN Boards overcharged residents for room and board across the state, but, in April, 2017, PCDSNB increased Valentine's room and board payment at Jewel group home to $634 a month, based on a formula approved by DDSN Defendants, without notice to or approval from her next of kin or the probate court, or providing any explanation of the justification for this increase.

261.    In addition to overcharging DDSN clients for room and board, two audits by federal investigators found that DDSN and DHHS were also billing the federal government for unallowable room and board expenses.

262.    In addition, Valentine was charged up to $106 a month for cable television which she shared with three other residents, as well as staff, without authorization from any family member or the probate court.

263.    Upon information and belief, in determining the rate charged to Valentine for room and board, PCDSNB did not credit her with the food stamp benefit the PCDSNB received on her behalf.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

264.    As Haley's Inspector General, Maley refused requests to investigate exploitation of clients by failing to properly credit those who received food stamps in setting room and board costs.

265.    Although Valentine received more than $1,000 a month in Social Security benefits, PCDSNB only allowed her to receive a $10 a week allowance, which, upon information and belief, was not always paid to her.

266.    When Valentine's allowance was stolen, PCDSNB did not report the theft to law enforcement, in violation of her constitutional right to equal protection.

267.    None of the Defendants informed Grate of the availability of home-based services or Grate's right to receive compensation for providing services to Valentine in her home.

268.    Thena, Owens and others at the PCDSNB retaliated against Valentine by keeping the funds in Valentine's checking account for months after she was discharged and did not assist Grate in transferring her Social Security benefits and other benefits to Grate, in an attempt to force her back into the unsafe facility and to protect themselves from being sued.

269.    In addition to failing to inform Grate of the availability of personal care attendant and nursing services for waiver participants who live at home.

270.    Owens and PCDSNB did not warn Grate of the dangerous condition of Valentine losing consciousness when her sodium levels dropped, or that she was entitled, as a waiver participant, to have nurses come into her home to monitor her condition and medications.

271.    DDSN received incident reports resulting from these events but failed to require PCDSNB to notify Valentine's authorized representative or to notify the representative themselves.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

272.    State Defendants had a common law duty of care to provide nursing services to Valentine upon her discharge from Jewel CTH II to monitor her condition and to protect her health and safety.

273.    DDSN and DHHS and their officials were aware that families were not informed of the availability of home-based nursing services through the DDSN Medicaid waivers.

274.    As is DDSN's practice, even after Valentine was removed from Jewel, DDSN continued to pay PCDSNB for the empty bed Valentine had vacated, instead of using those funds to provide services to her in Grate's home.

275.    In September 2017, Valentine lost consciousness, as she had done at Jewel, and she fell in the shower at Grate's home, hitting her head.

276.    Valentine was transported by ambulance to the hospital, where she died.

277.    When records were finally provided by PCDSNB after Grate was appointed as personal representative of Valentine's estate, Grate learned for the first time in 2018 about Valentine's condition that caused her to lose consciousness, that Valentine was overcharged for room and board, cable television and other expenses and that her "allowance" was not always paid to her by Anderson and PCDSNB.

278.    After Valentine died, Grate also learned that PCDSNB and Anderson had spent Valentine's funds purchasing a pre-need funeral from a funeral home not chosen by her next of kin.

### DDSN's Band Payment System and Failure to Protect Residents from Harm

279.    DDSN receives funds from the General Assembly to provide family support services that are not covered by Medicaid, as well as funds required to pay the state match for Medicaid waiver services.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

280.    The federal Medicaid agency, CMS (Centers for Medicare and Medicaid Services) pays the federal match to DHHS based on cost reports DHHS submits to CMS, DHHS then transmits those funds to DDSN, based on cost reports DDSN provides to DHHS.

281.    All Defendants were on notice of the long history of DDSN and DHHS failing to protect the health and welfare of clients receiving services in DDSN programs and the conversion of funds allocated by the General Assembly and CMS to provide services in the least restrictive setting for other purposes, including decades old unbuilt capital projects funded with taxpayer dollars.

282.    In 1995, the Civil Rights Division of the U.S. Department of Justice [DOJ] sent notice to the State of South Carolina that it was conducting an investigation into the conditions of DDSN facilities.

283.    DOJ reported daily abuses in these facilities, with residents being left unattended and sitting in their own urine and feces for hours and ten unexplained resident deaths in DDSN ICF/MR (now called ICF/ID) facilities occurring in just one month.

284.    Around the time that Defendants institutionalized Valentine, Butkus, Barfield, Lacy, Waring and Kerr joined together to establish and authorize a fraudulent "band" funding system that pays the lowest rates for waiver participants who live at home and incentivizes DSN boards to reduce needed services in violation of the Medicaid Act, the ADA and Section 504 of the Rehabilitation Act.

285.    Defendants made false and material representations to waiver participants, their families, the General Assembly and taxpayers that the band funding system fairly allocated funds to provide necessary supports to all DDSN clients in the least restrictive setting, knowing the falsity of their representations or recklessly disregarding the truth of the representations.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

286.    When band funding was established, DDSN assured families that services would be provided based upon service allocations made by a "circle of support" chosen by families.

287.    In 2003, as director of DHHS, Kerr conducted a "limited scope review" of Babcock Center, DDSN's largest private provider, which documented systemic abuse, neglect and exploitation of clients and that DDSN did not have controls in place to protect clients in DDSN facilities.

288.    In 2004, Kerr provided the Governor, legislators and the agencies results of an investigation conducted by Carolina Medical Review which documented that Babcock Center failed to protect residents in facilities funded by Medicaid and that Babcock Center was not in compliance with federal regulations.

289.    But, despite these repeated warnings and red flags, the Governor, Kerr, Butkus, Lacy, and Barfield failed to take necessary action to require DDSN and DHHS to make systemic changes in their programs, to eliminate the unaccountable and noncompliant band funding system and to require DDSN to use federal funds to provide supports so that families could remove their loved ones from unsafe facilities and be provided services and supports needed to keep their family member with disabilities at home.

290.    In 2005, South Carolina Protection & Advocacy for People with Disabilities sent its report called "Unequal Justice for South Carolinians with Disabilities: Abuse and Neglect Investigations" to the Governor's Office, DHHS, DDSN and to every legislator, including then Representative Haley, which reported systemic abuse, neglect and exploitation of DDSN clients living in residential programs.

291.    All Defendants were on notice of P&A's report which documented that:

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

a.      Reporting of abuse, neglect and exploitation was often delayed, or in some cases non-existent, and that delays in reporting presented serious problems with evidence preservation and victim protection;

b.      Little effort was made to refer abuse and neglect in DDSN facilities to law enforcement and DDSN had failed to address substandard investigative reports;

c.      Investigations were seriously flawed, and victims were not protected from further harm; and

d.      Cases reported to law enforcement did not receive the necessary investigative effort and they were rarely prosecuted.

292.    In 2006, Kerr, who was a CPA, released the results of a two-year study his agency conducted which documented that DDSN failed to protect the health and safety of Medicaid waiver participants, reporting that DHHS was unable to track federal funds once DHHS paid them to DDSN.

293.    In 2007, a DDSN Commissioner and the internal auditor of DDSN took records to the Governor's Office documenting DDSN's illegal conversion of tens of millions of dollars that had been allocated by the General Assembly to DDSN to provide services and the systemic failure to protect DDSN clients from abuse, neglect and exploitation.

294.    These records included evidence of kick-backs from DDSN to Babcock Center and back to DDSN.

295.    Records that the DDSN Commissioner and internal auditor of DDSN provided to Governor Sanford's office included documentation of purchases of real estate without authorization from the

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP390127

General Assembly, massive diversion of tens of millions of dollars allocated by the General Assembly to provide services and other violations of state and federal law.

296.    When Governor Sanford's Office refused to take action to address these allegations, this DDSN Commissioner met with DHHS Director Kerr and two legislators regarding the legality of the band funding system, and the rampant abuse, neglect and exploitation in DDSN programs.

297.    Then Attorney General Henry McMaster was informed of the abuse, neglect and exploitation of vulnerable adults in DDSN programs, but he also failed to take action to protect DDSN clients from harm, even death, or to prevent future violations of the constitutional rights of waiver participants to live in safe settings free from abuse, neglect and exploitation.

298.    Kerr's response was to kick the problem further down the road by recommending yet another study, even after admitting, after his own two-year study, that he was unable to follow the money once funds were paid to DDSN.

299.    After meeting with Keck and these legislators, the DDSN Commissioner and the internal auditor took these records to the South Carolina Legislative Audit Council and the DDSN Commissioner soon thereafter received an anonymous threat advising her to "back off" if she loved her children.

300.    In retaliation, an agent of DDSN caused a lawsuit to be filed against the internal auditor.

301.    Deputy State Director of Administration in charge of finances at DDSN, William Barfield arranged for Kerr to be paid by DDSN, within a few months of his retirement as director of DHHS, to conduct an "independent" study of the band funding system that Kerr, Barfield, Butkus, Lacy and others had concocted, a system which Kerr himself had described as unaccountable a few months earlier.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

302.    Kerr issued a report informing DDSN Commissioners and the public in 2007 that the system met Medicaid requirements, but he later testified that he never contacted CMS.

303.    CMS officials later testified that they were not even aware that South Carolina had established a band funding system and this funding system was never approved by the General Assembly.

304.    The audit of DDSN issued by the South Carolina Legislative Audit Council in December, 2008 confirmed the allegations of diversion of funds and the failure to protect DDSN clients from abuse, neglect and exploitation.

305.    That audit at http://lac.sc.gov/LAC_Reports/2008/Documents/DDSN.pdf is incorporated herein by reference.

306.    The LAC audit, like the P&A study, was provided to the Governor, every legislator and the directors and officers of DDSN and DHHS, and it reported that during the period 2004 through 2007 that:

a.    DDSN failed to disclose its operations to the public, to provide public access to its directives and denied Commission members access to public information, hindering them from performing their fiduciary duties.

b.    Serious gaps existed in oversight of consumers' health, safety, and well-being, which posed risks to DDSN's consumers.

c.    Despite repeated recommendations by DHHS and CMS, DDSN failed to obtain independent audits of its cost reports, leaving "a significant gap in accountability for millions of dollars."

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

d.    Other states license residential programs annually, but when Defendants established the band funding system, these programs were only licensed every three years. LAC found that DDSN failed to provide follow-up reviews and its licensing system was not independent or free of conflicts of interest that impeded objective reviews.

e.    DDSN failed to require national background checks for direct caregivers, as other states required, and was not properly handling threats to consumer safety related to abuse, neglect and exploitation of its clients.

f.    DDSN spent only $7.6 million out of the $25.4 million the General Assembly appropriated for new beds for the intended purpose, thereby losing the 70% federal match on those funds that were spent for other purposes.

g.    Out of $10.5 million appropriated for the program established to provide services to children with autism over the previous two years, DDSN spent just $671,917 (6%) for services and the LAC "could not determine how DDSN has used the additional funds it received for the autism program."

h.    DDSN informed LAC that funds not spent during a fiscal year were used for purposes not authorized by the General Assembly in subsequent years, and this policy, and this practice was subsequently confirmed in sworn testimony by Waring and Barfield.

i.    Funds allocated by the General Assembly to DDSN to provide rehabilitation services for persons with head and spinal cord injuries were not used during the year provided and a significant amount of those funds were used for other purposes not authorized by the General Assembly.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

j.      DDSN client funds were often mishandled by disabilities and special needs (DSN) board staff and DDSN did not have sufficient controls to ensure that consumers' funds were handled appropriately.

k.      Local DSN Boards were making errors in charging for room and board.

l.      DDSN established barriers to competition and consumer choice of providers, with only 3% of residential services being provided by providers other than DSN boards and DDSN provided financial benefits to DSN Boards not provided to other providers.

m.      DDSN provided capital grants to DSN Boards to purchase and maintain residential facilities without authorization from the General Assembly and failed to maintain contractual controls over DSN board performance, limiting competition and choice by waiving financial obligations of DSN boards.

n.      Because "DSN boards know they can mismanage their funds with impunity, they have less incentive to manage prudently and with adequate oversight" and the Boards did not have incentive to "ensure that their services protect the health, safety, and welfare of their consumers," resulting in recurring problems due to DDSN's failure to hold DSN boards accountable.

o.      Although DHHS had recommended in 2006 that DDSN's cost reports be independently audited, DDSN failed to implement those audits.

307.    A few months after LAC audit issued its report in 2008, Stanley Butkus retired as director of DDSN under pressure.

308.    When Butkus returned to South Carolina a few years later as the director of Mentor, Inc., Buscemi, Waring, Barfield and others at DDSN drastically increased the amount paid to that private corporation without notice to or authorization from the DDSN Commission.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

309.    Buscemi paid Mentor significantly more than the amount paid for waiver participants who live at home, despite that corporation's terrible record of deaths and abuse of DDSN clients living in Mentor group homes, thereby diverting funds intended to provide services to other clients in their own homes.

310.    In 2009, Defendants Butkus, Kerr, Lacy, Barfield and Mole conspired with others to falsely inform CMS, families and clients of DDSN and the public that due to a $4.6 million deficit in funding in fiscal year 2010, drastic reductions had to be made in home-based services.

311.    Mole, Buscemi and Danielson fraudulently misled members of the General Assembly about the funding system and then lobbied for additional funding under false pretenses.

312.    In 2009, DHHS and DDSN submitted an application to the federal government containing false claims that home-based services were being reduced and capped because DDSN's budget was reduced.

313.    When home-based services were capped and otherwise limited in fiscal year 2010, the average cost per ID/RD waiver participant actually increased from around $37,000 per year to more than $51,000 per year, and the total cost of the program actually increased by more than $50 million.

314.    DDSN and DHHS reduced these services without conducting a cost study to determine whether reducing home-based services would save any money or cost the state more money.

315.    DDSN and DHHS reduced these home-based services without consulting with its medical director, or any physician, to determine the medical consequences of reducing and capping those services.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

316.    The Governor's Office and the state agency defendants made false and material representations to the governing board of DDSN, the public, waiver participants and their families that reductions were necessary because of budget reductions.

317.    Valentine and other waiver participants suffered when budgets of DSN boards were reduced based on this false claim of a budget deficit, and funds were converted to illegally purchase, build or renovate real estate and for other purposes not authorized by the General Assembly, including to provide lucrative contracts to former government officials.

318.    Defendants converted Medicaid funds to bring unrelated industries to South Carolina and to purchase, build and renovate even more segregated sheltered workshops across the state that violated the integration mandate of the ADA and the Rehabilitation Act.

319.    The General Assembly was not informed of and did not approve the capping and reduction of services provided to DDSN clients or the continued purchase of real estate without legislative authorization, and those actions ignored the legislative directives of the Family Support Act.

320.    The Director of DHHS threatened at the first DDSN Commission meeting after the DHHS Medical Care Advisory Committee approved the waiver amendments in 2009 that if Commissioners did not approve the proposed caps, elimination of therapies and reductions, then thousands of waiver participants would lose services due to budget reductions, when, in truth the average cost per client actually increased by thousands of dollars when home-based services were capped.

321.    In 2010, based on these false claims of budget reductions, DHHS and DDSN imposed unreasonable limitations so that clients and families would have to "use or lose" services on a weekly (personal care attendant and nursing) or monthly (respite) basis, whereas before 2010,

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

personal care attendant, nursing and respite services were awarded on an annual basis, thus allowing families to "bank" services to be used in a family emergency.

322.    Those caps and limitations prohibited families like Valentine's, who did not have independent financial means, from keeping their loved ones at home and they increased the number of clients being admitted to DDSN residential programs or other more restrictive settings.

323.    By limiting hours provided to waiver participants who live at home, DDSN and DHHS kept its segregated and isolated institutional beds full and continued to pay boards for empty beds, at greater cost to taxpayers.

324.    The Comptroller General reported that DHHS allowed $225 million, nearly a quarter of its fiscal year 2010 budget to "lapse."

325.    That year, while claiming to have a drastic budget deficit, DDSN transferred more than $4.6 million to DHHS without authorization or knowledge of the DDSN Commissioners.

326.    From 2009 through 2011, DHHS and DDSN, including, but not limited to Haley, Soura, Baker, Butkus, Buscemi, Barfield, Mole, Waring, Lacy, Kerr and others conspired to cause hundreds of millions of dollars, that had been allocated by the General Assembly to provide services to Medicaid participants, to be used for other purposes.

327.    Defendants drastically reduced services provided in the homes of Medicaid waiver participants while increasing claims submitted to the federal government, including claims for room and board that are prohibited by the Medicaid Act.

328.     As a result of these reductions, families without significant financial resources were prevented from removing their loved ones from dangerous group homes like Jewel due to the caps placed on home-based services.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

329.    This allowed DDSN and its boards to keep their beds full, and to be compensated for empty beds, but DDSN cost reports submitted to DHHS, then to the federal government, were not reduced.

330.    Defendants failed to inform Grate and other families of waiver participants of the feasible alternative of receiving nursing services at home and allowed untrained staff to administer medications in group homes, in violation of the South Carolina Nurse Practice Act.

331.    After caps were imposed on home-based services, and funds paid to providers were reduced, the rates of deaths and injuries in DDSN facilities increased and homes around the state were understaffed and underfunded.

332.    U.S. Senator Chuck Grassley sent auditors from the United States Department of Health and Human Services Office of Inspector General (US DHHS OIG) to South Carolina in 2010 to audit the ID/RD waiver after his office receives reports of the improper use of federal funds.

333.    After the federal auditors Grassley sent to South Carolina left the state, Buscemi boldly and falsely reported to the DDSN Commissioners and the public that her agency passed that federal audit with flying colors, and that US DHHS OIG would not be issuing a written report, posting that information by wire on the agency's website.

334.    Contrary to Buscemi's report to DDSN Commissioners, US DHHS OIG had determined that DDSN claimed Medicaid reimbursement for unallowable room-and-board costs in an amount that approximated the amount of "deficit" DDSN falsely claimed to have in Fiscal Year 2010 in order to justify reducing and capping home-based services.

335.    US DHHS OIG required Haley's cabinet agency, DHHS, to repay the federal government $4.8 million - approximately the amount of the "deficit" DDSN claimed to have in FY 2010 - for

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

unallowable costs paid to DDSN, but the Governor and agency officials failed to inform the General Assembly of this debt and illegal diversion of funds.

336.   US DHHS OIG reported that: "The State agency claimed unallowable room-and-board costs because neither the State agency nor the Department had adequate controls to (1) ensure that the Department followed applicable Federal law and guidance or its own guidance or (2) detect errors or misstatements on the local DSN boards' cost reports."

337.   US DHHS OIG also reported in its 2012 report that the "Department did not prescribe a uniform format for the local DSN boards to follow when preparing the cost reports. Rather, each local board prepared its cost reports in its own format, making it difficult to identify when unallowable costs were claimed."

338.   In addition, US DHHS OIG ordered DHHS to reduce its cost report the next year by more than $9 million due to overpayments DHHS made to DDSN that were made based on these false insurance claims.

339.   In furtherance of the conspiracy, DHHS failed to reduce its cost report as it had been directed by OIG to do, "because it did not have controls in place to ensure that it refunded the Federal share of all overpayments on its CMS-64 within the required time after it was notified of overpayments."

340.   Governor Haley failed to disclose this overpayment or DHHS' obligation to repay the federal government to the General Assembly or the public and did not include a request in her executive budget to repay this debt.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

341. Instead, Haley, Baker, Soura, Buscemi, DHHS and others caused $4.8 million of funds allocated by the General Assembly to provide services to be fraudulently converted to pay this debt to the federal government.

342. When these funds were used to repay CMS for false and inflated claims, the state and families who needed services to return or remain in their homes lost more than $14 million in federal matching funds.

343. Several years after the first federal OIG audit, Grassley's federal auditors returned to South Carolina and they discovered that DHHS still had not reduced its cost reports by the required amount (more than $9 million) and federal auditors reported again that the accounting system used by DDSN and DHHS still did not assure the proper expenditure of funds.

344. To keep the General Assembly and the public from learning of her cabinet agency's mismanagement of federal funds and the need to repay this massive debt to the federal government, Haley schemed with Soura, Baker, Buscemi, Kerr, Barfield, Waring, Beck, Mole and others to insert a request in her executive budget for $13.3 million in new, recurring funds.

345. Haley informed the General Assembly that these recurring funds were needed to provide services to persons on DDSN's waiting list so as to avoid the General Assembly, the public and the media from learning that her cabinet agency overbilled the federal government millions of dollars at the same time it was reducing and capping services, falsely claiming to have a budget deficit.

346. When this scheme was concocted, Haley, Soura, Baker, Buscemi, Mole, Beck and the agencies knew that DDSN was hoarding more than $9 million in an excess funds account and that this account was growing by millions of dollars each year.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

347.    This fund included monies DDSN had set aside for two decades for still unbuilt construction projects that had never been constructed.

348.    Governor Haley transmitted her Executive Budget by wire, requesting millions of additional dollars knowingly and falsely informing the General Assembly that if they allocated the requested funds, South Carolina would receive federal matching funds, so that this $13.3 million would be leveraged to produce more than $40 million in new services.

349.    DDSN actually only provided $4 million in new services that year, and 70% of those funds were provided by the federal government, so that only $1.2 million of the $13.3 million in state funds included in Governor Haley's Executive Budget were used for the purpose allocated by the General Assembly.

350.    DHHS spent more than $10 million of the new, recurring funds requested by Governor Haley to repay the agency's debt to the federal government for overpayments, losing the 70% match the General Assembly had been assured by Haley, Soura, Baker, and Buscemi that the state would receive.

351.    Alarmed at the findings in the first US DHHS OIG audit, the Director of DHHS, Anthony Keck, contracted with a national consulting company, Myers & Stauffer, which was familiar with Medicaid programs, to conduct an audit of DDSN's payment system.

352.    When she learned of this audit, Buscemi entered an emergency contract with a more DDSN friendly consulting firm, in violation of the state procurement code, to contradict the Myers & Stauffer audit.

353.    Keck warned Haley, Buscemi and others that the band system was not actuarially sound and that it does not comply with federal requirements, or the federal mandate that providers be

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

allowed to bill DHHS directly, but Haley, Soura, Baker and Buscemi ignored these warnings and their duty of care to provide safe and effective, cost-effective treatments to DDSN clients.

354.    That same year, the Legislative Audit Counsel issued a follow up audit of its 2008 audit, reporting that DDSN had failed to comply with many of the recommendations made in the 2008 audit.

355.    After Keck advised Governor Haley of these violations, he wrote letters in 2014 ordering Buscemi to dismantle that funding system.

356.    Three weeks after Keck ordered Buscmi to dismantle the band funding system, so as to require DDSN to return to a compliant fee-for-services system and allow all providers to bill DHHS directly, Haley removed Keck and replaced him with her deputy chief of staff, Christian Soura as director of the multi-billion-dollar agency.

357.    When Haley hired Soura in 2011, she had informed state agencies, the General Assembly and the public that he joined her office as an "efficiency expert," working for just $1 a year, not disclosing the approximately $100,000 he was paid by the "nonprofit" thinktank she had established for Soura's benefit.

358.    Haley referred to Soura as her "fix it man," and he had access to financial information not provided to members of the general public, in addition to influence with legislators and agency officials.

359.    To prevent the General Assembly and the public from learning about the mismanagement of Medicaid funds, in furtherance of this fraudulent scheme, Haley and Soura terminated the contract with Myers & Stauffer to avoid having to repay the federal government even more for overbilling in DDSN programs.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

360. When Haley appointed Soura as director of DHHS, his only Medicaid related experience was that acquired working for Governor Haley.

361. Soura terminated all efforts to dismantle the illegal band funding system which Keck had directed Buscemi to do after informing Haley of the illegality of the band system.

362. Buscemi issued an emergency contract, in violation of the state procurement code, to conduct another study to contradict the Myers & Stauffer findings.

363. Soura terminated the Myers & Stauffer audit, reportedly because of the large amounts South Carolina would be required to repay the federal government for the agencies' unallowable and inflated cost reports.

364. In August 2016, Soura moved Joshua Baker, Governor Haley's Chief of Staff for Budget and Policy from the Governor's Office to DHHS.

365. Baker also had no experience administering Medicaid programs, except that obtained working for Governor Haley.

366. Haley had hired Baker for $60,000 a year in 2011, but by 2015, she increased his salary at DHHS to $90,000 a year.

367. According to the DHHS website, Baker was the "primary author" of Haley's fiscal year 2015-2016 and 2016-2017 Executive Budgets.

368. In 2017, Governor McMaster appointed Baker as director of DHHS and he now earns $168,043 a year.

369. When former DDSN Director Butkus returned to South Carolina as the Director of Mentor, Buscemi significantly increased Mentor's contract from $13.1 million to $19.9 million, despite

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

DDSN having placed a freeze on admissions to Mentor due to the high rate of abuse and neglect in that private corporation's group homes.

370.    As Governor Haley's Inspector General, Maley had covered up and minimized wrongdoing to protect the Governor and the agencies in investigations involving abuse, neglect, and exploitation involving DDSN clients, so that systemic injuries suffered by Valentine, her family and other similarly situated persons continued unchecked.

371.    Maley determined that funds DDSN paid to the Autism Society were being embezzled, but he did not recommend repayment of those funds back to DDSN, even after learning that files were being shredded during the investigation and the director of that nonprofit organization, Craig Stoxen, took his own life while Maley's investigation was in progress.

372.    Danielson had served with Stoxen on the governing board of the Babcock Center and Danielson was paid to locate a building for the Autism Society, purchased with funds diverted by DDSN, without authorization by the General Assembly.

373.    After a former DDSN Commissioner insisted upon an investigation of the widespread misappropriation of HUD funds by DDSN providers, Maley issued a report admitting that DSN Boards had been misappropriating HUD subsidies across the state.

374.    However, Maley only required DDSN to repay DDSN clients for two years of overpayments for room and board, despite the fact that boards had been overcharging clients for many years, and no guardian ad litem was ever appointed to protect the rights of the incapacitated victims.

375.    Maley also under-reported the number of deaths in his investigation of homes operated by Mentor, Inc., the private corporation then under the direction of former director of DDSN, Butkus.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

376.    When Haley resigned as Governor and moved to New York, she arranged for Maley to be hired by DDSN and paid more than $100,000 to study the illegal band funding system for nearly a year, but Maley failed to report to legislators or the public that this system is in clear violation of the anti-reassignment prohibition of the Medicaid Act.

377.    At the same time, Buscemi awarded the $240,000 contract to Kerr & Company to continue studying the band payment system.

378.    Maley, a third Haley bureaucrat with no experience managing Medicaid programs or programs that serve persons with disabilities, was appointed as interim director of DDSN in early 2018, when Buscemi resigned as director of DDSN to accept employment from a provider of DDSN services, Community Options – whose contract she had recently increased by millions of dollars.

379.    During Buscemi's tenure as director of DDSN, Community Options' contract was increased 66%, from $6.6 million in 2016 to $10.8 million in 2018, but Maley failed to inform legislative review committees of this illegal use of her public office for personal gain.

**The Jericho Project**

380.    While operating its programs with 31 direct care positions unfilled, Thena and PCDSNB conspired with other Defendants to contribute at least $50,000 from funds allocated by the General Assembly for services to construct a dormitory on the campus of a private religious college, called the Jerico Project, in violation of the State Constitution.

381.    This conversion of funds was made during the year when Valentine was assaulted by staff while the PCDSNB had 31 unfilled positions, and Grate was not informed of their right to receive

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

personal care attendant and nursing services at home, or of Grate's right to be paid to provide attendant care services.

382.    That same year, Defendants Buscemi, Waring, Beck and others converted an additional $250,000 in funds that were allocated to DDSN for services to the Jericho project and the Anderson County Disabilities and Special Needs Board each contributed $50,000 in taxpayer funds to the construction project on the grounds of this private college.

383.    Defendants knew or should have known this conversion of at least $350,000.00 of funds allocated by the General Assembly to provide services was illegal, based on the warnings issued by the Legislative Audit Council (LAC) in 2008, advising the agencies and the Governor's Office that huge sums were being improperly spent to purchase and renovate real estate not authorized in the state budget.

384.    These funds were committed by Buscemi without notice to her governing board until near the time of the groundbreaking.

385.    The 2008 LAC audit criticized DDSN for spending funds allocated by the General Assembly for services to pay for other purposes, but DDSN has continued to spend millions of dollars allocated for services to buy and upfit real estate without authorization from the legislature, including congregate day and residential facilities, some purchased for selected private corporations.

386.    When questioned about the Jericho project, Waring falsely informed DDSN Commissioners that the land upon which the dormitory in Pickens County would be built was owned by the PCDSNB, but that was not true.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

387.    Waring also informed Commissioners that this project would be jointly funded by the South Carolina Housing Trust Fund (HTF), but that also was not true, as no application had even been submitted to the HTF.

388.    Upon information and belief, the HTF still has not committed funds to this project, as doing so would violate Article XI, § 4 of the Constitution of the State of South Carolina which prohibits direct aid to religious or other private educational institutions prohibited.

389.    That Section of the Constitution of the State of South Carolina states that:

No money shall be paid from public funds nor shall the credit of the State or any of its political subdivisions be used for the direct benefit of any religious or other private educational institution.

### Family Support and WAD

390.    Also, in 2017, DDSN continued its practice of converting millions of dollars intended and allocated by the General Assembly to be spent on "Family Support" services to other purposes, in violation of legislative intent to provide services necessary for DDSN clients to live with their families and in violation of the integration mandate of the ADA and the Rehabilitation Act.

391.    S.C. Code 44-20-240 establishes three divisions at DDSN and the statute requires authorization by the governing board of the agency to establish new divisions.

392.    But, in 2017, without notice to or authorization of the DDSN Commission or the General Assembly, Defendants Buscemi, Beck, and Waring joined Baker and other DHHS officials in a scheme to convert more than a million dollars (that had been provided in the state budget to provide services to waiver participants) to establish a new division called the "Waiver Administration Division" (WAD) to review and systemically reduce services provided to waiver participants living

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

at home in disregard for the medical necessity of those services and without consulting with the participants' treating physicians.

393.    DDSN Commissioners first learned of this new "WAD" late in 2017, when questioning why DDSN's administrative costs increased by more than a million dollars over the amount authorized by the Commission.

394.    Defendant Buscemi and Defendant Beck then hired twelve new employees in 2016 or 2017 to work in the newly created "Waiver Administration Division"  to review plans of care using a nonstandardized similar tool created by unknown employees at DDSN and DHHS which was never approved by the DDSN Commissioners, CMS or the General Assembly and, upon information and belief, has not been used in other states or approved by CMS.

**COUNT ONE**
**Torts Claims Act and Common Law Torts**

395.    Plaintiffs refer to, reallege and incorporate by reference each and every fact and allegation in the paragraphs above, in addition to the investigations, reports and audits described above as if they were fully set forth in this cause of action.

396.    This count is brought pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-210 (2015) and the common law of torts to recover damages for personal injuries which both Valentine and Grate sustained as a direct and proximate result of the Defendants' wrongful acts, including, but not limited to Defendants' failure to supervise and monitor conditions and services, assault and battery, physical abuse, neglect and the failure to properly supervise Valentine and the provision of services by government funded entities in violation of Defendants' duty of care.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

397.    These violations were not actionable until Grate was appointed as Personal Representative of Valentine's estate, because Valentine did not have capacity to protect her rights due to her mental capacity of a young child.

398.    The State, the Office of the Governor, DHHS, DDSN, PCDSNB and the employees, contractors, and officials named herein had a common law duty of care to provide safe and effective treatment to Valentine, to provide supports to family members like Grate, a duty to spend funds only for purposes authorized by the General Assembly as set forth in the state budget, and a statutory duty to comply with all state and federal standards and they have consciously violated that duty through grossly negligent acts and omissions and negligent supervision, as described in more detail in the paragraphs above.

399.    Defendants knew that consents were being provided by persons without authority to consent and that systemically, families have not been kept informed about illnesses and injuries in DDSN residential and day programs to prevent families from learning of injuries, illnesses and other adverse events caused by Defendants' negligence, gross negligence and negligent supervision.

400.    The injuries Plaintiffs suffered were foreseeable and they could have been avoided through the exercise of ordinary care.

401.    Supervisory liability extends "to the highest levels of state government," and all the Defendants were in the decision-making chain and they are thus liable for deliberate indifference which caused injury to Plaintiffs.

402.    All Defendants named in this complaint were in possession of actual or constructive knowledge that their subordinates were engaged in conduct that posed "a pervasive and

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

unreasonable risk" of constitutional injury to Valentine and other residents of DDSN program through repeated investigations and audits of DDSN programs which were provided to Defendants.

403.    Governor McMaster, was especially aware of the dangerous conditions in DDSN facilities and programs, and of the state's ongoing failure to prosecute offenders from his years as Attorney General and Lieutenant Governor, and he failed to diligently investigate and prosecute violations of the constitutional and statutory rights of DDSN clients for years.

404.    Even before her election as Governor, Defendant Haley was aware of the systemic abuse, neglect and exploitation of DDSN clients through her service in the South Carolina General Assembly from 2004 to 2010, where she served on the Medical, Military, Public and Municipal Affairs Committee and she received reports of investigations, including the P&A report "Unequal Justice for South Carolinians," reporting on systemic abuse and neglect in DDSN funded facilities.

405.    As Governor, Haley received credible warnings from a former DDSN Commissioner informing her of severe problems related to abuse, neglect and exploitation of DDSN clients and she caused her office to call in at least three DDSN Commissioners in response to these allegations, yet she failed to take any actions to protect DDSN clients from further abuse, neglect and exploitation.

406.    Haley appointed Defendant Danielson, despite his history of failing to pay employment taxes at the largest provider of DDSN services for 46 weeks and his use of taxpayer funds to litigate a losing lawsuit against the federal government for failing to pay those taxes.

407.    To protect the money flow, in 2014, Haley replaced Anthony Keck as director of DHHS when he informed her of illegal practices in the administration of Medicaid programs operated by

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

DDSN and installed her "fix it" man, Christian Soura, who reversed the direction of Keck's efforts to bring South Carolina into compliance.

408.    Haley received evidence of systemic abuse, neglect and exploitation in DDSN programs not only through dozens of articles written in 2016 and 2017 about the rampant abuse, neglect and exploitation in DDSN programs, but also through a letter written by the former DDSN Commissioner she replaced with William Danielson.

409.    After McPherson wrote that letter clearly informing Governor Haley of serious safety and financial mismanagement problems in the DDSN system, three DDSN Commissioners were called into the Governor's Office as McPherson had suggested.

410.    Despite these warnings, Haley acted with conscious indifference to the violations complained of in this complaint in violation of her duty of care to citizens of South Carolina who have intellectual disabilities, which she acknowledged only upon her resignation as Governor on the way to the United Nations.

411.    Common law malice may be shown by actions of defendants that are reckless or wanton, meaning that the defendant was consciously indifferent toward the plaintiffs' rights.

412.    As described in more detail above, McMaster and Haley acted recklessly and were consciously indifferent to the rights of intellectually disabled persons in need of protection and services necessary for them to live in the least restrictive setting with their families, thereby causing harm to Plaintiffs.

413.    As described in more detail above, Buscemi also acted recklessly by ignoring systemic abuse, neglect and exploitation in DDSN programs, failing to protect DDSN clients from injury, failing to inform her governing board of illegal actions and contracts, by diverting funds needed to

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

provide necessary services and ignoring the directives of the General Assembly to provide supports needed for intellectually disabled clients to live at home.

414.    Butkus, Buscemi, Maley, Lacy, Mole and Beck regularly received incident reports from DDSN funded facilities and they were responsible for tracking and responding to reports of abuse, neglect and exploitation in DDSN programs and they failed to take action necessary to prevent harm to Valentine and other clients and their families.

415.    Lacy and Beck had a duty to monitor and track patterns of abuse, neglect and exploitation and they failed to warn Valentine's family of the injuries she suffered as a result of their conscious indifference to abuse, neglect and exploitation in DDSN programs.

416.    While in a position of trust, on or about April 21, 2017, Defendant Anderson physically assaulted Valentine, by pushing her, grabbing her hair, shoving her into the bathroom and slapping Valentine on the face, leaving a mark on her face.

417.    Valentine was placed in fear of bodily harm by Anderson's actions that recklessly caused intentional harm.

418.    Anderson inflicted unlawful, unauthorized violence on Valentine by grabbing her by the hair, slamming her head into her legs, forcing her into the bathroom and slapping her on the face.

419.    Anderson and the other Defendants were fully cognizant of their duty to provide safe and meaningful treatment to Valentine while she was attending programs funded by DHHS, DDSN and the PCDSNB and to supervise those programs.

420.    Valentine was subjected to ongoing abuse, neglect and exploitation by Defendant Anderson and others at Jewel CTH II, which conduct is evidenced by records of "unexplained" bruises and scratches, foot injuries, being burned by a cigarette and poor hygiene.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

421.    Defendant Anderson knowingly falsified medical records by informing health care providers that she was "next of kin" and the representative authorized to make health care decisions for Valentine.

422.    Defendants knowingly subjected Valentine to pain and injury by forcing her to walk around an asphalt track, despite Defendants having knowledge of her painful foot conditions.

423.    Defendants' response to the knowledge of this culture of abuse and neglect was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices."

424.    There was an "affirmative causal link" between the inaction of supervisors and the constitutional injury Valentine suffered resulting from Defendants' decision to keep her in an unsafe facility and failure to provide safe conditions and reasonable treatment.

425.    This wrongful conduct was widespread and Defendants knew through their own internal investigations, as well as the audits/investigations conducted by state, local and private investigators, in addition to media reports, that the conduct of their subordinates posed an unreasonable risk of harm of constitutional injury to Valentine and others in her class, yet their inaction and failure to protect Valentine and other waiver participants continued in the face of these documented widespread abuses.

426.    Defendants acted with conscious indifference by knowingly failing to require DDSN and DHHS to promulgate rules, procedures and regulations to protect consumers like Valentine from harm and to properly prevent, investigate, report and prosecute abuse, neglect and exploitation.

427.    Defendants had very good reason to anticipate the misconduct which injured Valentine, and their continued inaction and conversion of funds intended to benefit Valentine and other waiver

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

participants in the face of documented widespread abuses demonstrated that they were deliberately indifferent or acquiesced in the constitutionally offensive conduct of their subordinates.

428.     As a result of these violations, Valentine suffered physical injuries, including, but not limited to being forced to walk on an asphalt track built with improperly diverted funds, causing painful lesions on her feet that were infected with fungus due to the unsanitary conditions in DDSN facilities.

429.     Had Defendants not eliminated physical therapy and occupational therapy, and had those services been provided to Valentine, these injuries could have been avoided.

430.     Because DDSN and DHHS eliminated physical therapy and occupational therapy from the ID/RD waiver based on false claims of budget deficits, Valentine regressed and suffered painful muscle contractures which would have been prevented by providing those therapies.

431.     Defendants were aware of these conditions, as reported in multiple studies, including, but not limited to the study conducted by the University of South Carolina School of Public Health, which reported unsanitary conditions and other violations of waiver participants' rights.

432.     Valentine suffered permanent disfigurement, a decline in her functional capacity and injuries which contributed to her death as a result of the neglect, negligent supervision, negligent training and gross neglect of Defendants.

433.     As a direct and proximate result of the wrongful and outrageous actions of Defendants, Valentine and Grate endured physical pain and suffering.

434.     Defendants negligently failed to inform Grate of repeated injuries to Valentine or Valentine's fragile medical condition existing at the time of her discharge and history of medical

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

treatment for that condition, thereby preventing Valentine from obtaining the medical treatment she needed at home.

435.    Defendants failed to provide personal attendant care and nursing services that Valentine was entitled to receive when she was discharged from PCDSNB after being assaulted by Anderson.

436.    Due to this gross neglect, Grate suffered economic damages by not being paid to provide services for which she was entitled to be paid.

437.    Had Defendants provided these services, Valentine's injuries which caused her death could have been prevented.

438.    The Defendants, their agents and employees were willful, wanton, reckless, grossly negligent, careless and negligent in the following and other particulars:

a.    Failing to follow the standard of care and applicable rules in supervising consumers and failing to report injuries and abuse to Valentine's family;

b.    Failing to exercise appropriate control over Valentine's environment to protect her from harm;

c.    Failing to supervise employees who physically and mentally abused Valentine and failing to promptly report injuries to family members who were her next of kin;

d.    Failing to formulate policies, procedures and regulations to govern staff and personnel to provide a safe environment for clients;

e.    Failing to use due care in hiring, supervising, training, monitoring and conducting reviews of staff and personnel;

f.    Failing to provide services to DDSN clients that are necessary to ensure that they do not harm themselves or others;

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

g.      Failing to provide adequate care and treatment, notice to family members and to include the next of kin in planning meetings;

h.      Failing to use allocated funds for the benefit of Valentine and other waiver participants;

i.      Allowing Valentine to be assaulted, mistreated and injured and financially exploited;

j.      Doing or failing to do such other and further things that a reasonably responsible Defendant would have done under the circumstances then and there existing,

k.      Failing to provide the level of supervision DDSN and PCDSNB determined that Valentine needed, and

l.      Failing to provide the home-based services Grate needed to provide care for Valentine at home.

439.    Thena, Owens and Anderson intentionally harmed Valentine when she was on Defendants' premises, they knew or had reason to know of systemic neglect and abuses and failed to control their employees, and they had reason to know of the necessity and opportunity to exercise such control.

440.    Haley, Baker, Soura, Kerr, Butkus, Maley, Mole, Beck, Buscemi, Lacy, Barfield, Waring, and Danielson, in addition to violations within the scope of their employment, acted with actual malice and intent to harm and acted outside the scope of their employment when they diverted funds needed to protect the health, welfare and safety of Valentine and other DDSN clients, failed to enforce state and federal laws and regulations enacted to protect DDSN clients, ignored rulings of state and federal courts, failed to comply with the Adult Health Care Consent Act and to require

74

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

its agents to comply with the Act, eliminated and capped services and failed to establish reasonable standards for the operation of DDSN and DHHS programs.

441.    The unconstitutional confinement of Valentine, coupled with the negligence, gross negligence, negligent supervision of the Governors, and the DDSN, DHHS and PCDSNB Defendants named herein caused the injuries complained of which would not have occurred if reasonable care had been used under the circumstances.

442.    As a direct and proximate result of the aforesaid carelessness, needlessness, recklessness, willfulness, wantonness, negligence, gross negligence and failure to train and supervise subordinates, Defendants, their agents, employees and/or servants caused Valentine and Grate to suffer severe and permanent injuries, including without limitation, physical injuries, pain and suffering and loss of liberty and loss of enjoyment of life.

443.    The degree of reprehensibility of the defendant's misconduct is high in this case because during the time Valentine was being subjected to abuse, neglect and exploitation, the Governors, and Defendants from DDSN, DHHS, and PCDSNB knowingly allowed funds allocated by the General Assembly to be used for other purposes not authorized by the state budget, nor authorized by the DDSN Commission, nor made known to the public, as described above, while failing to provide the supports and funding needed to provide services for Valentine in the least restrictive setting.

444.    Defendants' behavior is also reprehensible because, knowing that PCDSNB was seriously understaffed, Defendants still diverted and converted funds that should have been spent providing care for Valentine at home to be used for other purposes, including illegally funding a dormitory on property owned by a private religious school.

445.   DDSN and PCDSNB Defendants had a duty to warn Grate about Valentine's fragile medical conditions.

446.   Had PCDSNB provided nursing and personal care attendant services and kept Grate informed about Valentine's medical conditions, Grate would have known that Valentine was at risk of falling when her sodium level dropped, but Grate was never informed of Valentine's right to receive those services, in violation of the feasible alternatives and amount, duration and scope requirements of the Medicaid Act.

447.   The Plaintiffs are entitled to an award of damages and punitive damages for these injuries in an amount to be determined by a jury, attorneys fees and costs.

**COUNT TWO**
**Americans with Disabilities Act**
**and Section 504 of Rehabilitation Act**

448.   Plaintiffs refer to and reallege each and every fact and allegation in the preceding Paragraphs as if fully set forth herein and they incorporate by reference all reports, audits and investigations described above as if they were restated below in this Count.

449.   It is undisputed that Plaintiff was a qualified individual with disabilities who had physical and/or mental impairments that substantially limited one or more of her major life activities, including, but not limited to thinking, walking, communicating, learning, working, caring for herself and concentrating. See 42 U.S.C. § 12102.

450.   Valentine was at risk of institutionalization or actually institutionalized at all times since being admitted to the DDSN ICF/MR in 1997.

451.   The treating professionals of the State determined that community-based treatment was appropriate for Valentine and she did not oppose community placement.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

452.   Valentine's needs could have been reasonably accommodated in the home of Grate without fundamentally altering the nature of how the State delivered services but for arbitrary caps Defendants caused to be placed on services provided in waiver participants' homes.

453.   Valentine's need for therapies to relieve pain and maintain use of her limbs could have been reasonably accommodated without altering the State's systems.

454.   Plaintiffs suffered discrimination by reason of Valentine's disability.

455.   Providing the personal care attendant and nursing services Valentine and Grate needed to live safely at home would not have fundamentally altered the state's system.

456.   The Governors, SCDHHS, SCDDSN, and local DSN Boards failed to make reasonable modifications in policies, practices and procedures where modifications were necessary to avoid discrimination on the basis of disability. 28 CFR § 35.130(b)(7).

457.   Section 504 of the Rehabilitation Act of 1973 provides that "no otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

458.   "Program or activity" includes a department, agency, special purpose district, or other instrumentality of a State or local Government. 29 U.S.C. § 794(b)(1)(A).

459.   The Medicaid Waiver programs administered by SCDDSN under contract with DHHS are "programs or activities" provided by the State of South Carolina that are funded by the federal government. 28 C.F.R. § 41.3(d).

460.   The Fourteenth Amendment's Due Process Clause provides that no State shall deprive any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

461.    The Medicaid Act required Defendants to inform Grate of the feasible alternatives under the ID/RD waiver program and to provide services in the amount, duration and scope necessary to prevent institutionalization while assuring Valentine's health and safety through the provision of waiver services.

462.    Supervisory liability for violations of the ADA and the Rehabilitation Act extends "to the highest levels of state government," and all of the Defendants were in the decision-making chain, making them liable when their deliberate indifference resulted in constitutional abuses, including, but not limited to violation of Valentine's and Grate's Fourteenth Amendment rights, in violation of the ADA and the Rehabilitation Act.

463.    Valentine had a Fourteenth Amendment right to receive safe and humane treatment free from abuse, neglect and exploitation and both Plaintiffs had a constitutional liberty right to live together as a family and Defendants intentionally violated that right.

464.    Grate had a property right to be paid a reasonable amount to provide personal care attendant services to her sister, as authorized by the ID/RD waiver and the agencies had an obligation to inform Grate of this reasonable accommodation, which was a feasible alternative under the waiver and Defendants intentionally violated that right also.

465.    DHHS, DDSN and the PCDSNB had a special relationship with Valentine and a duty of care to protect her from unsafe conditions, in addition to a duty to inform Grate, as Valentine's representative under the Adult Health Care Consent Act, of all of the feasible alternatives under the waiver program, which included receiving personal care and nursing services at home.

466.    Plaintiffs allege that Governors Haley and McMaster violated the ADA and the Rehabilitation Act by failing to assure that the state provided services and supports necessary to

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

integrate persons who have intellectual disabilities into the community in the least restrictive settings in violation of their statutory obligations and Fourteenth Amendment constitutional rights of the Plaintiffs.

467.    Haley and McMaster knew of the dangerous conditions in DDSN group homes and that funds allocated by the General Assembly to provide services in the least restrictive setting were being diverted by Haley and her cohorts, Soura, Baker and Maley, who intentionally violated Plaintiffs rights protected by the ADA and the Rehabilitation Act.

468.    Butkus and Buscemi intentionally deprived Valentine and other waiver participants of services in the least restrictive setting as required by the integration mandate of the ADA, thereby also violating S.C. Code 44-26-140, which required the state to provide care and habilitation in the least restrictive setting according to the participant's needs.

469.    That state statute requires DDSN to administer care and habilitation skillfully, safely, and humanely with full respect for the client's dignity and personal integrity and to develop services necessary to meet the needs of its clients.

470.    S.C. Code 44-26-140(D) prohibited DDSN from retaining any client at a level of care that is more restrictive than is warranted to meet her needs when alternative care is available.

471.    In compliance with state law and the ADA and Rehabilitation Act, DDSN was obligated to move clients from more to less structured living, larger to smaller facilities, group to individual residences, placement that was segregated from the community to placement that is integrated into the community; and dependent to independent living.

472.    The obligation was on the agency defendants to inform Grate of Valentine's due process rights under the feasible alternatives mandate, not to require Grate to request specific services without notification of what services were available under the waiver.

473.    Because PCDSNB and DDSN intentionally violated the Adult Health Care Consent Act by having Valentine and Grate sign consent and discharge forms as described above, Grate was unaware of the need for nursing services and around-the-clock hands-on supervision.

474.    DDSN failed to inform Grate of Valentine's right to an individualized plan of habilitation, or her right to participate in the planning process, to review and revise the individualized plan formulated by an interdisciplinary team and Valentine's treating physician so as to provide services in the least restrictive setting. S. C. Code of Laws 44-26-150.

475.    Defendants failed to provide Grate with a copy of Valentine's plan of habilitation or to involve Grate and a treating physician of Valentine's choice (exercised through Grate) in developing her plan of care.

476.    In violation of Valentine's rights under the Fourteenth Amendment, the ADA, the Rehabilitation Act and S. C. Code of Laws 44-26-160, Defendants subjected Valentine to chemical and physical restraints not authorized by Valentine's treating physician for the convenience of staff, as punishment, and as a substitute for a habilitation program.

477.    Defendants operated DDSN programs in violation of clients' Fourteenth Amendment rights and their rights under the ADA, the Rehabilitation Act and the Medicaid Act, by giving them no alternative but to attend congregate workshops and day programs, preventing them from leaving unsafe facilities and programs, failing to provide safe and appropriate treatment in less restrictive settings and obstructing their right to equal protection.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

478.    PCDSNB and its employees failed to notify Valentine's representative under the Adult Health Care Consent Act of injuries and illnesses which would have warned her family about the unsafe conditions at PCDSNB and the DDSN Defendants knew that PCDSNB and Valentine were signing consent forms without notifying Valentine's family of injuries and illnesses.

479.    Valentine's authorized representative, Grate, was not informed of or invited to her annual plan meetings and did not know that the plan of care prepared by Anderson and others at PCDSNB required Valentine to be required to walk around the asphalt track, causing Valentine to cry out in pain.

480.    Defendants failed to notify Valentine's representative of medication reviews where her family would have been warned of her condition which caused her to lose consciousness and repeated medication errors which exacerbated her condition and injuries.

481.    When Valentine's sister attempted to remove Valentine from Jewel CTH II in 2016 and 2017, in retaliation, Anderson and Owens insisted that she could not be moved without the consent of Valentine's aunt, who had no authority under the Adult Health Care Consent Act to make decisions for Valentine, thereby intentionally delaying her removal from the dangerous facility.

482.    Defendants, including agency officials and the Governor, the Lieutenant Governor and the Attorney General knew that that DDSN clients were being chemically restrained, abused, neglected and exploited in DDSN programs funded by DHHS, in violation of their Constitutional right to liberty and due process and the Rights of Intellectually Disabled Persons Act.

483.    Defendants failed to notify Grate of the use of restraints on her sister or to document less restrictive methods that had failed in Valentine's record.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

484.    Defendants retaliated against Grate when she advocated for the rights of her sister to be free from abuse and to live in the least restrictive setting and retaliated against Valentine in violation of the anti-retaliation prohibition of the ADA.

485.    In violation of the Fourteenth Amendment rights of Valentine and Grate, their rights under the ADA and the Rehabilitation Act, and S.C. Code of Laws 44-26-170, Defendants used behavior modification programs involving the use of aversive stimuli and seclusion as punishment without notice to or obtaining the consent of Grate.

486.    Defendants violated Valentine's Fourteenth Amendment rights to reasonably safe conditions of confinement, freedom from bodily and chemical restraints, and to appropriate training and services in the integrated setting of Grate's home, where she would not have been segregated and isolated from non-disabled persons in congregate facilities.

487.    The Governors and agency Defendants violated the ADA by failing to ensure that the funds paid to the State, SCDDSN and DHHS were spent appropriately for services Valentine and other DDSN clients needed, despite repeated warnings from the South Carolina Legislative Audit Council, federal and state audits showing that SCDDSN and DHHS were spending those funds improperly.

488.    Defendants failed to consider the State's obligations under the ADA in allocating funds necessary to provide necessary community-based services to Valentine and Grate, allocating only ten to twelve percent of DDSN's home and community-based funds to provide services to more than seventy percent of DDSN clients who live at home.

489.    Defendants failed to consider their obligations to Valentine, Grate and others under the ADA by expending tens of millions of dollars unnecessarily to purchase and renovate real property

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

used as congregate Work Activity Centers where persons who have disabilities have been financially exploited.

490.    The state has violated the ADA by prohibiting personal care attendants in home settings to administer medications while allowing non-licensed staff in group homes to administer medications with minimal training.

491.    Without conducting a cost analysis to determine the cost of alternative services, including, but not limited to the cost of WAC services and the real estate funded by SCDDSN, the agencies imposed illegal caps on services that prevented Valentine and others from receiving services in their own homes and failed to spend available funds to comply with Defendants' obligations under the ADA and the Rehabilitation Act and they have ignored the ruling of the South Carolina Court of Appeals in *Stogsdill v. DHHS* to assess waiver participants needs for services without regard to the caps imposed in 2010.

492.    Defendants were intentionally indifferent to the medical and other treatment needs of Valentine and the needs of Grate for additional supports in the family home, which was the most integrated setting appropriate to Valentine's needs.

493.    Defendants' practices of systemically forcing DDSN clients into congregate residential and day programs constituted a form of discrimination based on disability which is prohibited by Title II, 42 U.S.C. § 12101(a)(2), (5).

494.     The requisite causal connection is satisfied here, where the Defendants set in motion a series of events that they knew or reasonably should have known would cause others to deprive the Plaintiffs of their constitutional rights.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

495.   Valentine's and Grate's needs and liberty rights could have been reasonably accommodated by providing funding necessary for Valentine to live outside of a congregate setting, with her family in the least restrictive setting, and it would not have fundamentally altered the nature of the State's programs.

496.   Defendants violated Valentine's rights to equal protection and her liberty rights by failing to make reasonable modifications to the programs operated by SCDDSN which were necessary for her to receive services in the least restrictive setting and intentionally withholding communications with Valentine's family.

497.   The willful and intentional acts of Defendants placed Valentine at risk of harm and caused her to be illegally segregated and isolated in a congregate group home and day program where she was repeatedly subjected to abuse, neglect and exploitation.

498.   Supervisors may be held accountable for wrongdoing by an agent when, as in this case, the supervisors had actual or constructive knowledge that their subordinates were engaged in activities that posed a pervasive and unreasonable risk of constitutional injury to citizens like Valentine and Grate, the supervisors' response to that knowledge was inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and, as here, an affirmative causal link existed between the supervisors' inaction and the constitutional injuries suffered by the Plaintiffs.  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

499.   The State, including the Governors, DHHS, DDSN and PCDSN Board violated Plaintiffs' rights under Title II of the ADA and they have been consciously indifferent to constitutional injuries to residents of DDSN group homes by tacitly authorizing these offensive practices.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

500.    There is an affirmative causal link between the supervisory Defendants' actions and inaction in this case and the constitutional injuries suffered by the Plaintiffs, including the violation of their rights under the ADA, the Rehabilitation Act and Fourteenth Amendment to liberty and freedom from abuse, neglect and exploitation.

501.    Plaintiffs request a finding that Defendants violated the ADA, including, but not limited to the anti-retaliation prohibition of that Act, Section 504 of the Rehabilitation Act and the implementing regulations of those federal laws and an order requiring that Defendants pay monetary damages, attorney fees, expenses and costs in such amount as a jury shall determine to be just and fair.

## COUNT THREE
## Fraud and Misrepresentation

504.    Plaintiffs refer to and reallege each and every fact, allegation and claim set forth in the preceding paragraphs as if fully set forth herein and incorporate by reference all reports, audits and investigations as if they were restated below.

505.    The elements of fraud are: a representation; its falsity; its materiality; knowledge of its falsity or a reckless disregard of its truth or falsity; intent that the representation be acted upon; hearer's ignorance of its falsity; hearer's reliance on its truth; hearer's right to rely; and hearer's consequent and proximate injury. *Florentine Corp., Inc. v. PEDA I, Inc.*, 287 S.C. 382, 339 S.E. (2d) 112 (1985).

506.    When South Carolina reduced and imposed caps on home-based services in 2010, the Defendants falsely informed the public and state and federal courts that these caps were required and controlled by CMS, the federal Medicaid agency, but the scheme to reduce home-based

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

services was concocted and promoted by Defendants, and not initiated by or required by the federal government.

507.   Based on false claims of budget reductions, DHHS imposed arbitrary caps on ID/RD waiver services and eliminated physical therapy, occupational therapy and speech therapy, without notice to or input from local boards, clients or families, or even the governing board of DDSN.

508.   The DDSN and DHHS Defendants and the Governor's Office made false representations to DDSN clients and their families that the band system fairly allocated costs and that home-based services were reduced and capped in 2010 because of budget reductions, as described above.

509.   The DDSN and DHHS Defendants and the Governor's Office made false representations to the governing board of DDSN that home-based services and therapies provided in homes of waiver participant were being capped or eliminated due to budget deficits when they knew that the per capita cost increased by thousands of dollars when home-based services were reduced.

510.   Owens made false representations to Grate that if she removed Valentine from PCDSNB, her Medicaid waiver eligibility would terminate in thirty days.

511.   Defendants had knowledge of the falsity of these representations, they recklessly disregarded the truth and they intended that Medicaid participants, their families, and taxpayers who were ignorant of their falsities, act upon the false representations.

512.   Valentine did not have the mental capacity to understand the violations complained of or to protect herself from these illegal acts and no one had the authority to bring this action until Grate discovered these violations and was appointed as her personal representative in December 2017.

513.   Plaintiffs had a right to rely upon the truth of Defendants' representations and they relied upon those representations in good faith.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

514.    Medicaid participants, their families and taxpayers, including the Plaintiffs, suffered consequent and proximate injuries because of Defendants' false representations and reductions, the caps placed on home-based services and elimination of needed therapies.

515.    One consequence of these reductions was that Valentine and others were not provided personal care attendant and nursing services they were entitled to receive that could have allowed Valentine and Grate to live safely and without government interference at home as a family, in the least restrictive setting, instead forcing Valentine to live in a dangerous group home where she was abused, neglected and exploited.

516.    When home-based services were capped and reduced, taxpayers like Grate also suffered, because the cost of the ID/RD program increased by more than $50 million a year, despite services and budgets of waiver participants being reduced and funds allocated to provide services in the least restrictive setting were diverted to purchase real estate and to pay for contractual services that did not benefit DDSN clients and their families the General Assembly intended to support.

517.    Grate suffered damages as a result of this fraud, because she was not paid to provide personal care attendant services which she was entitled to be compensated under the ID/RD waiver for providing.

518.    Governor Haley, Soura and Baker made false representations to the General Assembly that $13.3 million in new recurring funds would be used to provide services to persons on the waiting lists and would be matched with federal funds, as described above, knowing that these representations were false, recklessly regarding the truth, taxpayers and families had the right to rely upon these representations, Defendants intended for them to rely thereupon and taxpayers and

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

families suffered consequent and proximal damages by paying increased taxes and not receiving the services that were intended to be provided.

519.    Despite these funds being recurrent and having not been used as intended the first year, Haley, Soura, Baker and Buscemi went back to request additional recurring funding in subsequent years, failing to use all funding provided by the General Assembly again for the intended purposes.

520.    DDSN, DHHS, Kerr, Barfield, Butkus, Lacy, Waldrep and other agency officials joined together with the Governor's Office to cap home-based services in 2010 based upon blatantly false and fraudulent claims of budget deficits.

521.    Defendants intended that these false representations be acted upon and the affected participants and their families were ignorant of the falsity of Defendants' representations.

522.    Waiver participants and their families relied upon the truth of these representations and had the right to rely upon Defendants' representations.

523.    Waiver participants and their families suffered consequent and proximate injuries as a result of these false representations, when needed services were denied, and when DDSN and DHHS used funds that had been allocated to provide services in the least restrictive setting instead as a slush fund which benefitted Kerr, Barfield, Butkus, Buscemi and other Defendants.

524.    Defendants either knew of the falsity and materiality of these claims or they acted in conscious disregard for the truth.

525.    Plaintiffs were ignorant of the falsity of Defendants' claims and relied on the truth of those claims.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

526.    Defendants intended that Plaintiffs would rely upon the truth of their misrepresentations and Plaintiffs had a right to rely upon those representations, they were consequently injured thereby, and the Defendants' actions proximately caused those injuries.

527.    The harm Defendants caused by their fraudulent acts was both physical and economic; the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; the targets of Defendants' conduct had financial vulnerability; the conduct involved repeated actions; and the harm was the result of intentional malice, trickery, and deceit, rather than mere accident.

528.    Plaintiffs are entitled to actual and punitive damages because Defendants acted with reckless and conscious disregard for their rights by fraudulently converting funds allocated to provide services to other unrelated purposes and violating Plaintiffs' Fourteenth Amendment rights.

529.    Plaintiffs are also entitled legal fees and costs.

## COUNT FOUR
### Civil Conspiracy

530.    Plaintiffs refer to and reallege each and every fact, allegation and claim set forth in the preceding paragraphs as if repeated below in this Count.

531.    A civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff.

532.    A plaintiff need not allege an unlawful act to state a cause of action and lawful acts may become actionable as a civil conspiracy.

533.    Conspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators, and other circumstances.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

534.    Civil conspiracy involves acts that are by their very nature covert and clandestine and usually not susceptible of proof by direct evidence.

535.    The gravamen of a civil conspiracy claim is the damage resulting to the plaintiff from the acts taken in furtherance of the combination; accordingly, the damages alleged must go beyond the damages alleged in other causes of action to avoid surprise to the other party.

536.    Acting outside of the scope of their employment, Butkus, Kerr, Barfield, Waring, Lacy, Mole and Waldrep joined together for the purpose of restricting waiver participants' access to home-based services needed to avoid living in DDSN congregate group homes and attending DDSN workshops, thereby forcing Valentine and other waiver participants to remain in DDSN congregate group homes and workshops where they were being abused, neglected and exploited.

537.    Grate suffered emotional and financial injury due to Defendants' conspiracy.

538.    As a result of the caps placed on home-based waiver services and ongoing reductions in services which violated the integration mandate of the ADA, persons living in group homes and attending workshops were denied the services they needed to escape these abusive and neglectful placements.

539.    Acting outside of the scope of their employment, Governor Haley joined with Soura, Baker, Waring, Danielson, Buscemi, Barfield, Waring, Kerr and Beck to intentionally convert funds intended by the General Assembly to provide services in the least restrictive setting to be used instead to repay the federal government for false cost reports DDSN and DHHS had submitted to CMS and other purposes not authorized in the state budget, thereby losing federal matching funds.

540.    Defendants knowingly and intentionally caused harm to waiver participants and their families through the acts complained of above by failing to use these funds to provide services in

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

the least restrictive setting of waiver participants' own homes in the amount, duration and scope needed to prevent institutionalization.

541.    Defendants were consciously indifferent to the ongoing abuse, neglect and exploitation of DDSN clients and the retaliation against families and employees who reported the failure to protect the rights of those clients.

542.    These Defendants joined together for the purpose of injuring plaintiffs, thereby causing them special damages more specifically described above, including severe emotional distress and the misappropriation of Valentine's social security and food stamp benefits.

543.    Valentine's Social Security benefits and workshop salary exceeded the cost of room and board by more than $400 a month, yet Valentine was paid an allowance of only $10 a week and, upon information and belief, she was charged for services that should have been paid by Medicaid.

544.    The wrongful appropriation of those funds, and payment to PCDSNB for services that ought to have been paid by Medicaid and emotional damages suffered by both Grate and Valentine constitute special damages.

545.    Anderson received between $13 and $16 a month in Valentine's food stamp benefits, but, upon information and belief, PCDSNB charged her the same amount for room and board as charged to waiver participants who did not receive food stamps and the conversion of those funds constitute special damages.

546.    Special damages also include damages to Grate as a taxpayer resulting from Defendants' conversion of taxpayer dollars for illegal and improper purposes.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

547.   Plaintiffs have presented above both direct and circumstantial evidence from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise.

548.   Plaintiffs are entitled to an amount determined by a jury in actual and punitive damages, in addition to legal fees and costs.

**COUNT FIVE**
***Quantum Meruit* and Unjust Enrichment**

549.   Plaintiffs refer to and reallege each and every fact, allegation and claim set forth in the preceding paragraphs as if fully set forth herein.

550.   *Quantum meruit* is an equitable doctrine which allows recovery for unjust enrichment under a quasi-contract theory.

551.   The elements of a *quantum meruit* claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value.

552.   As described above, Defendants were conferred benefits through the services provided by Grate when Valentine was abused and removed from Jewel CTH II to protect her from further harm, and Defendants failed to inform Grate of home-based services available through the waiver program, including paying a family member to provide attendant care services.

553.   Defendant realized that benefit and it would be unjust for Defendant to retain that benefit without paying its value.

554.   Plaintiff Grate is entitled to compensation for her services at the rate paid by DHHS to DDSN for personal care attendant services, legal fees and costs.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP390I274

555.    Plaintiffs pray for a reasonable value of Grate's performance of services, in addition to legal fees and costs.

## COUNT SIX
## Wrongful Death and Survival

556.    Grate is the sister of Valentine, who lived in her home from the time Valentine was discharged until her premature death.

557.    Valentine's death was caused by the wrongful acts, neglect, gross and neglect and default of PCDSNB, DDSN and DHHS which are described above.

558.    Valentine suffered pain and anxiety as a result of Defendants failing to warn Grate about her condition and health history and the failure to provide nursing and personal care attendants Valentine needed to live safely at home.

559.    Valentine died as a direct and proximate result of the acts of negligence, gross negligence, recklessness, willfulness and wantonness of the Defendants named herein.

560.    Grate suffered mental shock at the death of Valentine and upon learning that her sister's death could have been prevented had Defendants not acted in a grossly negligent manner by intentionally preventing Valentine's family of learning of patterns of abuse, neglect and exploitation at PCSDNB and failing to inform Grate, or any family member with authority under the Adult Health Care Consent Act, of her condition which required monitoring, nursing services and constant supervision.

561.    Grate also suffered the loss of Valentine's companionship due to the deliberate, reckless, and negligent actions of Defendants Buscemi, Thena, Owens, Anderson and others who may be identified during discovery.

ELECTRONICALLY FILED - 2018 Nov 30 2:53 PM - PICKENS - COMMON PLEAS - CASE#2018CP3901274

562.    Damages resulting from these wrongful acts include medical bills and funeral costs, lost wages, including future earnings, lost benefits, pain and suffering during loss of support and companionship, punitive damages for willful, wanton, reckless, and intentional conduct and other damages yet to be determined.

## PRAYER FOR RELIEF

563.    Plaintiffs pray that this Court will grant each and every award the relief requested herein and order Defendants to pay damages and punitive damages as determined by a jury, in addition to legal fees and costs.

564.    Plaintiffs pray that this Court will order such other relief as shall be just under the circumstances.

Respectfully submitted,

s/Patricia Logan Harrison
Patricia Logan Harrison
57 Rosemond Road
Cleveland, South Carolina
803 360 5555
pharrison@loganharrisonlaw.com

s/ William I. Bouton
William I. Bouton
Wilkins & Bouton
1012 E. Washington Street
Greenville, South Carolina 29601
864 312 3901
wbouton@wilkinsbouton.com

November 30, 2018
Greenville, South Carolina